# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| BP LITIGATION RECOVERY I, L.L.C., | |
| Plaintiff, | |
| v. | Civil Action No.  4:15-CV-1061 |
| BP, P.L.C.; BP AMERICA, INC.; BP EXPLORATION & PRODUCTION, INC.; ANTHONY B. HAYWARD; and DOUGLAS J. SUTTLES, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## COMPLAINT AND JURY DEMAND

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................2

JURISDICTION AND VENUE ..........................................................................6

PARTIES .............................................................................................................7

    A.    Plaintiff ...................................................................................7

    B.    Defendants .............................................................................7

    C.    Significant Non-Parties .........................................................9

FACTUAL ALLEGATIONS ............................................................................11

I.    The Deepwater Horizon Blowout and the Gulf Oil Disaster ................11

    A.    The Technology and Perils of Deepwater Drilling ...............11

    B.    BP and the Gulf of Mexico ..................................................14

    C.    The Macondo Well and the Deepwater Horizon ..................15

    D.    A Blowout at the Macondo Well Causes an Explosion on the Deepwater Horizon, Killing Eleven People, and Leads to the Worst Environmental Disaster in American History .......................................................21

    E.    BP Initially Shirks Responsibility for the Blowout ..............22

    F.    The Deepwater Horizon Sinks into the Gulf of Mexico .......23

    G.    The Government's Response ................................................23

    H.    The Blowout Preventer Fails ...............................................24

    I.    BP Improvises to Stop the Oil Spill .....................................24

    J.    The Oil Leak is Finally Stopped ..........................................29

    K.    The Worst Environmental Disaster in United States History ................................................30

II.    BP's Alarming Internal Flow Rate Estimates ....................................31

III.    BP Intentionally Misrepresents the Flow Rate to the Public in Order to Downplay the Magnitude of the Gulf Oil Disaster ..................................................36

IV.     The Truth Gradually Emerges ........................................................50

V.      The DOJ's Criminal and the SEC's Civil Actions against BP and Certain BP
        Employees Relating to Flow Rate Misrepresentations ......................................56

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ...............................................61

        A.      April 24, 2010 False and Misleading Statements ...................................61

        B.      April 25, 2010 False and Misleading Statements ...................................62

        C.      April 28, 2010 False and Misleading Statements ...................................63

        D.      April 29, 2010 False and Misleading Statements ...................................63

        E.      April 30, 2010 False and Misleading Statements ...................................64

        F.      May 4, 2010 False and Misleading Statement ......................................65

        G.      May 5, 2010 False and Misleading Statements .....................................65

        H.      May 14, 2010 False and Misleading Statements ...................................66

        I.      May 17, 2010 False and Misleading Statements ...................................67

        J.      May 19, 2010 False and Misleading Statements ...................................68

        K.      May 21, 2010 False and Misleading Statements ...................................69

        L.      May 22, 2010 False and Misleading Statements ...................................69

ADDITIONAL ALLEGATIONS OF SCIENTER......................................................71

PRESUMPTION OF RELIANCE...................................................................72

LOSS CAUSATION.............................................................................73

NO SAFE HARBOR............................................................................78

FIRST CAUSE OF ACTION ...................................................................79

SECOND CAUSE OF ACTION ..................................................................80

PRAYER FOR RELIEF .......................................................................82

JURY DEMAND ..............................................................................83

Plaintiff BP Litigation Recovery I, L.L.C. ("Plaintiff") is the assignee of purchasers of American depositary shares issued by BP p.l.c. (the "BP ADS").  Plaintiff, through its undersigned attorneys, by way of this Complaint and Jury Demand, for its federal securities claims against BP p.l.c., BP America, Inc., BP Exploration & Production Inc., Anthony B. Hayward and Douglas J. Suttles (collectively, the "Defendants"), allege the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Plaintiff's information and belief is based on, among other things, an investigation by its attorneys, which investigation includes a review and analysis of:  BP's public filings with the United States Securities and Exchange Commission ("SEC"); press releases and public statements issued by BP and its representatives; media reports; publicly available data relating to the prices and trading volumes of BP ADS; documents and pleadings filed or entered in the numerous BP securities actions pending before the United States District Court for the Southern District of Texas, including the Court's Memoranda and Orders deciding Defendants' motions to dismiss with respect to the consolidated class action complaint (10-md-2185), the "first tranche" of individual securities fraud actions (*see, e.g.*, 12-cv-1256), and the "second tranche" of individual securities fraud actions (*see, e.g.*, 12-cv-3715); the Phase One Trial Findings of Fact and Conclusions of Law and the Phase Two Trial Findings of Fact and Conclusions of Law issued by the United States District Court for the Eastern District of Louisiana on September 4, 2014, and January 15, 2015, respectively, in the action *United States v. BP Exploration & Production, Inc.*, No. MDL 2179 Section J, as well as certain trial documents from the Phase One and Phase Two trials in that action, available at http://www.mdl2179trialdocs.com; documents and pleadings filed or entered in the United States' criminal actions against BP

Exploration and Production, Inc. (*United States v. BP Exploration & Production, Inc.*, 12-cr-292 (E.D. La.)), former BP drilling engineer Kurt Mix (*United States v. Kurt E. Mix*, 12-cr-171 (E.D. La.)), and former BP executive David Rainey (*United States v. David Rainey*, 12-cr-291 (E.D. La.)); documents and pleadings filed or entered in the SEC's civil actions against BP p.l.c. (*Securities and Exchange Commission v. B.P. p.l.c.*, 12-cv-2774 (E.D. La.)) and former BP executive Keith Seilhan (*Securities and Exchange Commission v. Keith A Seilhan*, 14-cv-893 (E.D. La.)); the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling's Report to the President of the United States, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling* (Jan. 11, 2011); and the Chief Counsel's Report to the National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, *Macondo: The Gulf Oil Disaster* (2011).

Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiff believes that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      The BP ADS at issue in this action were purchased between April 29, 2010 and May 28, 2010.  Plaintiff brings this action under the federal securities laws to recover for the investment losses suffered as a result of numerous false and misleading statements made by BP and its representatives that were designed to downplay the magnitude of the worst environmental disaster in the history of the United States (the "Gulf Oil Disaster").

2.      On April 20, 2010, the Deepwater Horizon offshore drilling rig was working for BP on an exploratory deepwater well in the Gulf of Mexico.  The Deepwater Horizon was fifty miles out to sea and drilling a well in 5,000 feet of water.  At about 9:45 p.m., oil and gas started

escaping from the well and shooting up onto the Deepwater Horizon's deck.  Before the crew had time to stop the leak, the oil and gas ignited, causing an explosion that killed eleven crew members.  The remaining crew members of the Deepwater Horizon escaped either in lifeboats or by jumping off the rig into the sea as flames engulfed the semisubmersible structure.  Two days later, the Deepwater Horizon sunk to the bottom of the ocean.

3.      BP deployed remotely operated vehicles to examine the wreckage and determine what damage, if any, had been caused to its well.  The images transmitted back to BP by the unmanned submarines revealed BP's worst nightmare – oil was spilling from the well into the Gulf of Mexico.

4.      BP immediately deployed its vast resources to try and stop the oil spill.  This effort included compiling teams of engineers and scientists at BP's headquarters in Houston to determine the amount of oil that was flowing from the well.  These engineers and scientists inputted proprietary information that BP had obtained while drilling the well into sophisticated computer software designed to determine flow rates.

5.      The flow rates that BP's engineers and scientists came back with were alarming.  BP's scientific estimates indicated that as much as 6.1 million gallons (or 146,000 barrels) of oil per day was billowing into the Gulf of Mexico from BP's well.  Most of BP's estimates measured the flow rate at at least 2.1 million gallons (or 50,000 barrels) of oil per day.

6.      To make matters worse, there was nothing BP could do to immediately stop the flow of oil.  Prior to having the well drilled, BP had implemented only one source control measure to combat an oil spill – a device called a "blowout preventer" that was installed on top of the well at the seabed and that contained shears designed to cut the drill pipe and shut in the well.  However, when the explosion occurred, the blowout preventer failed to function properly.

BP's only post-explosion avenue for stopping the oil spill, therefore, was to dig relief wells and manufacture improvised devices to capture the oil, all of which took months to prepare and execute.

7.     Because it was not able to quickly stop the oil spill, BP consciously lied about the amount of oil that was gushing into the Gulf in order to avoid further damage to its reputation and business.

8.     In a series of press conferences, media interviews, securities filings and even when testifying before Congress, in April and May 2010 BP intentionally downplayed the impact of the oil spill and radically understated the amount of oil that was flowing from the well.  These lies caused the price of BP ADS to be artificially inflated.

9.     BP initially publicly disclosed that only 1,000 barrels of oil per day were flowing from the well.  BP's Chief Operating Officer for the Gulf of Mexico told the public that the oil spill was "considerably lower, considerably lower," than what had spilled out of the Deepwater Horizon a few days earlier, and that the oil spill was "a long way away from something more significant."

10.     A few days later, however, the federal government released an estimate (based on the limited data it had available to it) of 5,000 barrels per day.  BP then upped its public estimate to 5,000 barrels per day, even though its internal figures – which were based on more reliable data and better technology than the government was using – were significantly higher.  Indeed, BP used the 5,000-barrels-per-day figure to continue to publicly diminish the severity of the oil spill.  BP's CEO told one media outlet that, "the environmental impact of this disaster is likely to be very, very modest."

11.     BP stuck with a 5,000-barrels-per-day flow rate for several weeks, even when independent sources started questioning the accuracy of that estimate.  Although these independent estimates were consistent with BP's internal modeling, which showed flow rates well in excess of 5,000 barrels per day, BP executives publicly dismissed them as fantastical, stating, "we don't think the rate's anywhere near that high."

12.     When BP's own engineers began to question BP's public position that its best estimate of the flow rate was 5,000 barrels of oil per day, BP executives were quick to censor them.  For example, on May 15, 2010, a senior BP engineer warned several BP executives:  "We should be cautious standing behind a 5,000 [barrels of oil per day] figure as our modeling shows that this well could be making anything up to ~ 100,000 [barrels of oil per day]."  After sending this email, the engineer was called into the office of a BP executive and told not to put anything like that in writing.

13.     Several weeks after BP finally capped the well and stopped the oil spill, a group of government and independent scientists revealed that the actual flow rate of the oil spill was 62,000 barrels of oil per day at the outset of the spill and then 53,000 barrels of oil per day by the time the well was capped and shut in on July 15, 2010.

14.     Any doubt that BP committed fraud in the immediate aftermath of the Gulf Oil Disaster is dispelled by the subsequent judicial proceedings against BP.  On November 15, 2012, BP pled guilty to criminal charges filed by the Department of Justice on the grounds that it, among other things, misled Congress about the flow rate of the oil spill.  On the same day, BP consented to the entry of a final judgment in a civil action filed by the SEC that alleged that BP had made materially false and misleading statements about the flow rate.  In connection with those actions, BP agreed to pay almost $6 billion in fines and penalties.

15.    Moreover, BP's misstatements about the flow rate have been the subject of a lengthy and complex trial before the United States District Court for the Eastern District of Louisiana that involved hundreds of documents, scores of fact witnesses, and testimony from several experts.  On January 15, 2015, the Court issued its findings of fact with respect to flow rate.  Among other things, the Court concluded:

> **There is no dispute that BP lied about the amount of oil that flowed from the well**.  The evidence shows that BP repeatedly told government officials that its best estimate for flow rate was 5,000 barrels of oil per day, which BP's internal documents showed there was little basis for this estimate and actual flow rates were significantly higher.[1]

16.    The effect of BP's lies about the flow rate was to artificially inflate the price of its stock.  Plaintiff's BP ADS were purchased during the time when BP, unbeknownst to the investing public, was making fraudulent statements downplaying the severity of the Gulf Oil Disaster.  As the truth about the flow rate was gradually disclosed and processed by the market, Plaintiff's assignors suffered millions of dollars in losses.

17.    Plaintiff brings this action to recover the damages its assignors suffered as a result of Defendants' fraud.

## JURISDICTION AND VENUE

18.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78r and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

19.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

---

[1]    Unless otherwise noted, bold and italic emphasis in quotations has been added and did not appear in the original quotation.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred in this District.

21.     In connection with the acts, transactions and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange and market.

**PARTIES**

A.     **Plaintiff**

22.     Plaintiff BP Litigation Recovery I, L.L.C. is a Delaware limited liability company with its main office location in Medford, Massachusetts.  Plaintiff is the assignee of claims under the federal securities laws arising from the purchases of BP ADS by certain entities (each an "Assignor" and collectively, the "Assignors").

23.     Assignor Howard Hughes Medical Institute ("HHMI") validly and irrevocably assigned its claims under the federal securities laws arising from its purchases of BP ADS to Plaintiff.  The dates on which HHMI purchased BP ADS during the relevant period are attached hereto as Exhibit A.

24.     Assignor Gargoyle Strategic Investments L.L.C. ("Gargoyle") validly and irrevocably assigned its claims under the federal securities laws arising from its purchases of BP ADS to Plaintiff.  The dates on which Gargoyle purchased BP ADS during the relevant period are attached hereto as Exhibit B.

B.     **Defendants**

25.     Defendant BP p.l.c. is a public limited company incorporated in England and Wales with its principal executive offices in London, England, and its North American

headquarters in Houston, Texas.  BP p.l.c. serves as the parent company to the BP group of companies.  The BP group of companies is referred to throughout this Complaint collectively as "BP."  BP p.l.c.'s equity securities are traded in the United States in the form of BP ADS.  As of December 31, 2009, each BP ADS represented six ordinary shares of BP p.l.c.  BP ADS are listed on the New York Stock Exchange ("NYSE") and are evidenced by American depositary receipts.  As a foreign private issuer whose equity securities are listed on the NYSE, BP p.l.c. is required to file certain annual and event-based reports with the SEC.  BP p.l.c. is responsible for BP's worldwide operations.  At all relevant times, BP p.l.c. directly or indirectly controlled BP America, Inc. and BP Exploration & Production Inc.  BP p.l.c. made false and/or misleading statements as alleged herein.

26.     Defendant BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP p.l.c., is a Delaware corporation with its principal place of business in Houston, Texas.  BP is responsible for all of BP's operations throughout the United States.  At all relevant times, BP America controlled BP Exploration & Production Inc.  BP America made false and/or misleading statements as alleged herein.

27.     BP Exploration & Production Inc. ("BP E&P"), a wholly-owned subsidiary of BP p.l.c., is a Delaware corporation with its principal place of business in Houston, Texas.  BP E&P is responsible for all of BP's exploration and production business in the United States, including BP's deepwater oil and gas drilling in the Gulf of Mexico.  BP E&P made false and/or misleading statements as alleged herein.

28.     Defendant Anthony B. Hayward ("Hayward") joined BP in 1982.  He held a series of senior management positions before he became an Executive Director of BP in 2003.  Hayward was appointed as BP Group Chief Executive – BP's highest-ranking officer – in 2007.

Hayward was BP's Group Chief Executive at the time of the Gulf Oil Disaster.   Hayward resigned from BP effective October 2010 in the wake of the Gulf Oil Disaster.   Hayward made false and/or misleading statements as alleged herein.

29.     Defendant Douglas J. Suttles ("Suttles") is another former BP employee who left the company following the Gulf Oil Disaster.   Over the course of his tenure with BP, Suttles held a number of senior leadership posts, including as President of BP Alaska.   In October 2007, Suttles was named Chief Operating Officer for BP's Exploration and Production business.   He retained this position during the Gulf Oil Disaster, and was based in Houston, Texas during that time.   Suttles was also a member of the Board of Directors of BP America as well as the BP America Operations Advisory Board.   Suttles became known as the public face of BP's response to the Gulf Oil Disaster during its immediate aftermath, representing BP at the Unified Area Command press conferences in Louisiana and providing several interviews to the media.   In January 2011, BP announced that Suttles was "retiring."  However, Suttles subsequently joined a smaller energy company, Encana, as President and Chief Executive Officer in June 2013 after the dust from the Gulf Oil Disaster had settled.   Suttles made false and/or misleading statements as alleged herein.

### C.     Significant Non-Parties

30.     Robert W. Dudley ("Dudley") joined BP in 1998 when BP merged with the Amoco Corporation.   Dudley was appointed an Executive Director of BP in April 2009.   At the time of the Gulf Oil Disaster, Dudley was an Executive Vice President of BP with responsibility for broad oversight of BP's activities in the Americas and Asia.   Between June and September 2010, he served as the President and Chief Executive Officer of BP's Gulf Coast Restoration Organization in the United States.   Dudley replaced Hayward as BP Group Chief Executive in October 2010.   BP made false and/or misleading statements through Dudley as alleged herein.

31.     H. Lamar McKay ("McKay") held a variety of roles before becoming Executive Vice-President of BP America and COO in 2007.  McKay joined the BP executive management team in June 2008.   McKay was appointed Chairman and President of BP America in February 2009, serving as BP's chief representative in the United States, a position he held at the time of the Gulf Oil Disaster.  At all relevant times, McKay was based in Houston, Texas.  BP made false and/or misleading statements through McKay as alleged herein.

32.     Andrew G. Inglis ("Inglis") joined BP in 1980 but resigned from the company in the wake of the Gulf Oil Disaster.  Following a series of commercial roles in exploration, in 1996 he became Chief of Staff, Exploration and Production.   From 1997 until 1999, he was responsible for leading BP's activities in the Gulf of Mexico.   Inglis was appointed Chief Executive of BP's Exploration and Production Business and an Executive Director in 2007.  Thus, Inglis headed the branch of BP that oversaw offshore drilling.   Inglis was BP's Chief Executive of BP's Exploration and Production Business at the time of the Gulf Oil Disaster.

33.     David Rainey ("Rainey") was BP America's Vice President of Exploration for the Gulf of Mexico.  As a senior executive at BP, Rainey represented BP during a briefing to the House Subcommittee on Energy and Environment in Congress on May 4, 2010, and then prepared BP's May 24, 2010 response to a congressional request concerning the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well.  Rainey has been indicted for obstruction of Congress and making false statements to federal investigators concerning the flow rate of the oil spill after the Macondo blowout.  His criminal trial is currently scheduled to begin on June 1, 2015.

## FACTUAL ALLEGATIONS

I.     **The Deepwater Horizon Blowout and the Gulf Oil Disaster**

     A.     **The Technology and Perils of Deepwater Drilling**

34.     Oil forms beneath the Earth's surface as a result of organic material being exposed to intense heat and pressure over millions of years.  The liquid and gas "hydrocarbons" that are created as a result of this process flow upwards through porous mineral layers beneath the surface, but are often prevented from reaching the surface by impermeable layers or rock above them.  The oil reservoirs where hydrocarbons become trapped in porous layers underneath impermeable layers are known in the drilling industry as "payzones."

35.     The process of drilling for oil involves drilling wells through the impermeable layers to reach these payzones.  Once a path to the payzones has been drilled, the hydrocarbons can flow up to the surface.

36.     The first oil wells were drilled on land and involved relatively low-pressure oil reservoirs.  As oil companies drilled out into the ocean, however, they encountered larger hydrocarbon deposits, often in more porous and permeable geological formations.

37.     "Deepwater drilling" involves drilling wells on the seabed often several thousand feet below the surface.  While the large oil reservoirs found at such depths make deepwater drilling very lucrative from a financial perspective, the risks involved in drilling thousands of feet below the sea into high pressure reservoirs make the practice extremely dangerous.

38.     For example, deepwater drilling equipment is exposed to strong ocean currents, lower temperatures, and higher pressures, which create numerous obstacles and uncertainties for the drilling crew.  Because of the depth at which they are drilling, drilling crews also have to work with higher volumes of chemicals and larger equipment.  Moreover, the equipment installations and maintenance at the top of the well, or "wellhead," on the ocean floor can only

-11-

done by unmanned submarine robots operated remotely from the surface, which adds another layer of difficulty to an already complex operation.

39.     There are several component parts of a deepwater drilling operation.  Typically, a drilling rig, such as the Deepwater Horizon rig, floats on the surface of the sea above where the well is to be drilled, often using thrusters to keep it in place.  Connected to the drilling rig is a long tube called the "riser."  The other end of the riser attaches to a "blowout preventer" or "BOP," which is attached to the wellhead on the seafloor as a safety device to stop unwanted hydrocarbon exits from the well.  The riser is attached to the blowout preventer by a "lower marine riser package," or "LMRP," at the top of the BOP stack.  This setup can be illustrated as follows:



40.     The crew drills the well by feeding a "drill pipe" from the rig through the riser and the blowout preventer.  Using the drill pipe, the crew drills through the rock under the blowout preventer until it reaches the payzone, typically several thousand feet below the sea floor.  The hole that is drilled from the sea floor to the payzone is known as the "wellbore."

41.     To drill the wellbore, crews on the drill rig use rotary drill bits that they lubricate and cool with synthetic fluids called "drilling mud."  The crew pumps the drilling mud down through the drill pipe to turn the drill bit.  The mud flows out holes in the drill bit and then circulates back to the rig through the space between the drill pipe and the side of the wellbore (the "annulus") and then up through the riser, carrying to the surface bits of rock called "cuttings."  When the mud returns to the rig at the surface, the cuttings are sieved out and the mud is sent back down the drill pipe.  The drilling mud is thus circulated through a closed loop from the rig to the bottom of the well.

42.     Monitoring and controlling pressure when drilling a deepwater well is extremely important.  The drilling crew controls pressure by adjusting the weight of the drilling mud.  The drilling mud needs to be heavy enough to create sufficient downward pressure to prevent hydrocarbons from escaping up the well during the drilling process (which, when it occurs, is known as a "kick"), but light enough so that the drilling mud does not fracture the surrounding rock and cause "lost returns" (where the mud leaks into the rock formation surrounding the well rather than being circulated back to the rig).

43.     When the pressure inside the well is higher than the pressure outside the well, the well is considered to be "overbalanced."  When the pressure inside the well is lower than the pressure outside the well, the well is considered to be "underbalanced."

44.     To stabilize the wellbore, the crew lines its walls with a series of steel tubes called "casing."  As the well deepens, the crews drops new casing through the inside of the existing casing, creating a "casing string."  Thus, a typical deep-water well is about three feet or more in diameter at the wellhead, but narrows to around ten inches or less at the bottom of the well as the casing string telescopes down.  The casing string protects more fragile sections of the well

structure from the pressure created by the drilling mud.  It also prevents hydrocarbons from entering the wellbore and flowing up the well.

45.     After the casing has been placed in the wellbore, it is cemented into place.  To cement the casing, the crew pushes cement down the inside of the casing using drilling mud. Once the cement reaches the bottom of the well, it passes through the "reamer shoe" and is pushed back up the well outside the casing through the annulus, where it is left to set.  In order to make sure the cement is evenly distributed as it is pushed up the annulus, the crew places centralizers on the casing so that the gap between the casing and the outside of wellbore is even all around.  If the casing is not centralized, the well will not cement properly and gaps will be left through which hydrocarbons can escape.  The cement also needs to have the right chemical composition to make sure it evenly distributes up the annulus.

46.     When a cement job is properly performed, it achieves "zonal isolation."  Zonal isolation means that the well is isolated from the hydrocarbon-bearing zones outside the well, and hydrocarbons cannot enter into and escape up the well.

47.     If zonal isolation is not achieved, the well can experience a kick.  Unchecked, a kick in the well can develop into a "blowout" – an uncontrolled flow of hydrocarbons into the well and possibly to the surface.  If the drilling crew finds that it is not able to control the pressure in the well during the drilling or cementing process and a blowout occurs, the blowout preventer should automatically activate and shut in the well.  If the blowout preventer fails to function properly after the crew loses control of the well, the consequences can be devastating.

**B.      BP and the Gulf of Mexico**

48.     BP was founded in 1908 as the Anglo-Persian Oil Company.  It changed its name to British Petroleum in 1954.

49.     BP built its business around drilling for crude oil in the Middle East.  However, in the 1970s, the oil-producing Middle East nations announced the nationalization of their oil resources.

50.     With its traditional area of supply now cut off due to nationalization, BP faced bankruptcy.  The company was saved, however, by Sir John Browne, who reorganized BP's exploration arm and refocused BP on high-risk/high-reward opportunities in other parts of the world.

51.     One of the areas on which Browne focused was the Gulf of Mexico.  In the late 1990s, BP's Gulf exploration team made a series of remarkable deepwater discoveries in the Gulf of Mexico.  When BP acquired Amoco and ARCO around the turn of the century, BP inherited a large portfolio of leases and assets in the Gulf of Mexico.  BP soon became the largest oil producer in the Gulf of Mexico.

52.     New drilling vessels and advances in drilling technologies allowed BP to drill out farther into deeper waters.  Between 1998 and 2001, BP discovered several giant deepwater oil fields in the Gulf of Mexico.

53.     In August 2002, Browne announced that BP would spend $15 billion during the next decade drilling and developing its discoveries in the Gulf of Mexico.  The deepwater areas of the Gulf of Mexico thus became the cornerstone of BP's growth strategy.

54.     BP's strategy of developing multiple deepwater fields at once, however, was aggressive and largely unprecedented.

C.      **The Macondo Well and the Deepwater Horizon**

55.     On March 19, 2008, BP acquired a lease from the federal government for 5,760 acres of property called the Mississippi Canyon Block 252 ("MC252"), a deepwater area several miles off the coast of Louisiana from which BP hoped to extract oil.

56.     As operator and primary leaseholder of MC252, BP's responsibilities included assessing the geology of the site, engineering the well design, obtaining regulatory approval for well operations, retaining and overseeing contractors, and working on various aspects of the well and drilling operations.

57.     In 2009, BP began drilling a well in approximately 5,000 feet of ocean in MC252. BP named the well "Macondo" after the fictional town in Gabriel García Márquez's novel, *One Hundred Years of Solitude*.

58.     The well was located approximately 50 miles south of the Louisiana coast.

59.     BP's only line of defense against an oil spill disaster at the Macondo well was the blowout preventer sitting on the sea floor.

60.     A blowout preventer is positioned on top of the wellhead and is meant to act as a barrier that can be activated, either manually or automatically, to shut in a well and prevent hydrocarbons flowing up into the riser if there is a kick or a blowout.

61.     The blowout preventer that BP configured for the Macondo well had several sealing components that are graphically illustrated below:

The Blowout Preventer



- The upper annular preventer and the lower annular preventer were designed to close around the drill pipe and seal the annulus. They were not designed to cut through or seal the drill pipe.

- The blind shear rams were blades that were designed to shear the drill pipe and seal the well. The blind shear rams were the only components designed to both cut the drill pipe and seal the well.

- The casing shear rams were also blades, but they were not designed to seal the well upon closure.

- The upper and middle variable bore rams functioned like the annular preventers in that they were designed to seal the annulus but were not designed to shear or seal the drill pipe.

- The test rams were designed to seal the annulus, but only with respect to flow coming from above, and not flow coming up from the well.

62.     There were two methods by which the blowout preventer was meant to shut in the well automatically.  The "deadman" function was designed to occur when there was a loss of power, communication, or hydraulic supply between the rig and the blowout preventer.  When that occurred, the battery-powered control pods on the blowout preventer were meant to cause the blind shear rams to close.

63.     The other automatic method was the "autoshear" function.  This was meant to occur if the lower marine riser package sitting on top of the blowout preventer became detached from the blowout preventer, which would occur if the drilling rig drifted out of position.  Upon the occurrence of such an event, a hydraulic function would cause the blind shear rams to automatically close.

64.     BP contracted with Transocean Holdings, LLC ("Transocean") to drill the Macondo well.

65.     On October 6, 2009, the Marinas rig began drilling the Macondo well.   In November 2009, the Marinas rig left the Macondo well after the rig was damaged by Hurricane Ida.

66.     The Deepwater Horizon drilling rig replaced the Marinas drilling rig at the Macondo well.

67.     Drilling the Macondo well did not go smoothly.  Some called it the "well from hell."  During the drilling process, BP experienced kicks in the well on October 26, 2009, and again on March 8, 2010, both of which required the well to be shut in temporarily.  The well also experienced multiple lost return incidents.

68.     BP stopped drilling the Macondo well at a depth of 18,360 feet and transitioned to installing the production casing, cementing the casing, and temporarily abandoning the well.

69.     Temporary abandonment is the process by which a well is secured so the operator can safely leave the well before returning to begin completion procedures.  BP wanted the Deepwater Horizon to temporarily abandon the Macondo well so that a production rig could move in and start extracting oil from the well.

70.     When the cement was pumped into the Macondo well on April 19, 2010, it failed to achieve zonal isolation.  The United States District Court for the Eastern District of Louisiana has found that this was because:  (1) the float collar in the casing near the bottom of the well did not convert during cementing preparations, meaning that when cement was pumped down the casing it was able to flow back up the casing because the float collar valves had not been triggered to prevent reverse flow; (2) a breach occurred in the shoe track – the casing below the float collar at the bottom of the well – which allowed cement to escape from, and hydrocarbons to enter into, the casing; and (3) the cement composition was unstable (although the cement composition did not ultimately matter given the fatal structural flaws described in (1) and (2)).

71.     Failing to achieve zonal isolation when cementing the casing left the Macondo well at risk of a blowout once the drilling mud was removed from the well during temporary abandonment.

72.     To test the integrity of the well after the cement job, BP performed two pressure tests on April 20, 2010:  the positive pressure test and the negative pressure test.

73.     During the positive pressure test, the blind shear rams on the blowout preventer were closed and additional fluid was pumped into the well below the blind shear rams.  If the pressure remained stable, it would mean that the casing had integrity and fluid was not leaking out of the well.  If the pressure began to decline, it would mean that fluid was leaking out of the well.  The positive pressure test performed on the Macondo well was successful.

74.     However, the positive pressure test did not test (i) whether the float collar at the bottom of the well had converted, (ii) the integrity of the casing below the float collar, or (iii) the integrity of the cement in the shoe track or the annulus.  In order to test these factors, BP had to conduct a negative pressure test.

75.     In a negative pressure test, some of the drilling mud in the well is replaced with lighter fluid so that the well becomes underbalanced.  The pressure in the well is bled down to zero.  This simulates conditions in the well after temporary abandonment.  In a successful negative pressure test, the pressure in the well should remain at zero.  If pressure increases after the pressure has been bled from the well or fluid escapes from the well through a "kill line" attached to the blowout preventer, it indicates that hydrocarbons are entering the well when they should not be.

76.     The negative pressure test on the Macondo well was conducted over three hours in the early evening of April 20, 2010.  During the negative pressure test, the crew of the Deepwater Horizon saw the pressure in the drill pipe increase.  This indicated that the well's integrity had been compromised.  However, because no fluid was flowing out of the well through the kill line, the negative pressure test was declared a success.

77.     After conducting the two pressure tests, the crew of the Deepwater Horizon began replacing the drilling mud at the top of the well and in the riser annulus with seawater in a process known as "final displacement."  Once the drilling mud was removed, however, the hydrocarbons that were entering the well through the breach in the shoe track were able to escape up the well, which caused a kick, and then led to a catastrophic blowout.

**D.**    **A Blowout at the Macondo Well Causes an Explosion on the Deepwater Horizon, Killing Eleven People, and Leads to the Worst Environmental Disaster in American History**

78.    Around 9:38 p.m. on April 20, 2010, hydrocarbons started flowing out of the Macondo well and up through the riser.  About two minutes later, mud began to spill onto the deck of the Deepwater Horizon.

79.    In response, the crew of the Deepwater Horizon activated the blowout preventer's upper annular preventer.  Although the upper annular preventer closed, it did so around where two segments of the drill pipe met, which meant that the drill pipe did not seal closed.

80.    Around 9:46 p.m., high pressure gas reached the surface of the Deepwater Horizon.  In response, the crew of the Deepwater Horizon activated the blowout preventer's upper and middle variable bore rams.  Because these devices only sealed the riser annulus, they caused pressure in the drill pipe to actually increase and did not prevent hydrocarbons from flowing up the riser to the rig.

81.    At 9:49 p.m., gas escaping up through the riser and onto the Deepwater Horizon rig ignited and exploded.  The initial explosion was followed by a second.  These explosions were so powerful that they sent crew members hurtling through the air.

82.    Eleven crew members of the Deepwater Horizon were killed during these explosions.

83.    The remaining 115 crew members of the Deepwater Horizon escaped either in lifeboats or by jumping into the water.

84.    Flames engulfed the Deepwater Horizon due to the ignited hydrocarbons flowing up from the well onto the drilling rig.

E.   **BP Initially Shirks Responsibility for the Blowout**

85.     BP's immediate response to the Macondo blowout was not to take responsibility for the disaster, but rather to point its finger at Transocean for causing the explosion and to charge the federal government with the responsibility for responding to the blowout.

86.     On April 21, 2010, BP issued two press releases.  The first simply "confirmed" that Transocean had issued a statement reporting a fire onboard the Deepwater Horizon.  By incorporating Transocean's statement rather than providing its own version of events, BP was clearly trying to place the blame for the explosion on Transocean's shoulders.  Indeed, BP perpetuated this theme over the course of the next few weeks, persistently referring to the rig as the "Transocean Deepwater Horizon rig" and reminding the public that Transocean had contracted to drill BP's well.

87.     The second press release issued by BP on April 21, 2010, although ostensibly an offer of support to Transocean, was actually a less-than-subtle attempt by BP to distance itself from any responsibility for the Deepwater Horizon explosion, the resulting loss of life, and for preventing the environmental damage and other harm that was likely to ensue:

> BP today offered its full support to drilling contractor Transocean Ltd. and its employees after fire caused ***Transocean's semisubmersible drilling rig*** Deepwater Horizon to be evacuated overnight, saying it stood ready ***to assist*** in any way in responding to the incident.
>
> . . .
>
> ***BP, which operated the license on which Transocean's rig was drilling an exploration well, said it was working closely with Transocean and the U.S. Coast Guard, which is leading the emergency response***, and had been offering its help – including logistical support.
>
> Transocean reported the fire earlier today on the rig, located approximately 41 miles offshore Louisiana on Mississippi Canyon block 252, saying that a "substantial majority" of the 126

personnel on board were safe, but some crew members remained unaccounted for. A number of personnel were reported to be injured.

88.     As explained in more detail below, as the public backlash against BP began to swell when it became clear that BP was responsible for the blowout, BP embarked on a propaganda campaign to downplay the severity of the disaster through misrepresentations about the amount of oil flowing from the Macondo well.

### F.     The Deepwater Horizon Sinks into the Gulf of Mexico

89.     On the morning of April 22, 2010, the United States Coast Guard reported that oil was flowing out of the Deepwater Horizon rig at 8,000 barrels per day, but that it could not do anything to stem the flow of oil until the fire on the rig was extinguished.

90.     A few hours later, however, the Deepwater Horizon rig sunk into the Gulf of Mexico.

91.     When the rig sank, the riser that connected the rig to the wellhead broke off from the rig. About 4,000 feet of the riser was still attached to the wellhead and sank to the ocean floor. The riser looped back around as it fell, such that its open end landed on the sea floor approximately 2,000 feet from wellhead.

92.     During the ensuing days, BP discovered that oil was spilling into the sea from tears where the riser was bent over at the wellhead, through other leaks further up the riser, and from the open end of the riser.

### G.     The Government's Response

93.     In accordance with various federal laws and regulations, the federal government was required to appoint a Federal On-Scene Coordinator ("FOSC") to direct and monitor the response to the oil spill. On or about April 23, 2010, the commander of Coast Guard District 8, Rear Admiral Mary Landry, was appointed FOSC for the Deepwater Horizon response.

-23-

94.     On April 23, 2010, Admiral Landry established the Unified Area Command in Robert, Louisiana.  The Unified Area Command recognized BP's offices in Houston as an Incident Command Post working on source control.

95.     Over the next few weeks, Unified Area Command gave frequent press briefings to inform the public about the extent of the disaster and the efforts that were being made to combat the oil spill.  Defendant Suttles was BP's spokesperson at, and actively participated in, these press briefings.

96.     The Unified Area Command relied heavily on BP to provide it with information and assistance to combat the oil spill.  As explained in more detail below, however, BP deliberately misled government officials and the public because it wanted to protect its public image and reduce the damage to its business.

**H.     The Blowout Preventer Fails**

97.     On April 20, 2010, the blind shear rams on the blowout preventer did not activate automatically as they should have done when the blowout occurred.  The blue control pod failed to activate the blind shear rams because its battery was depleted.  The yellow control pod failed to activate the blind shear rams because it was improperly wired.

98.     Between April 21 and April 28, 2010, BP made no fewer than sixteen attempts to manually activate the blowout preventer with remotely operated vehicles ("ROV").  All of these attempts, however, were unsuccessful in stopping the oil spill.

**I.     BP Improvises to Stop the Oil Spill**

99.     After its attempts to activate the blowout preventer failed to stop the oil spill, BP fabricated several ways to try and stop the oil spill while it dug a relief well designed to kill the Macondo well.  The problem with drilling a relief well is that it can take weeks, if not months, to complete.  Thus, BP needed to find another way to stop the oil spill in the interim.

100.    On May 8, 2010, BP attempted to lower a large coffer dam (a dome) over the broken area of the riser.  The coffer dam was designed to capture the leaking oil and direct it up to the surface to a collection vessel.

101.    The following is a diagram, which appeared in the *New York Times*, of how the coffer dam was supposed to work:

The Coffer Dam



102.    As BP lowered the coffer dam into the sea, it filled with methane hydrates (a result of the leaking oil mixing with sea water), which negatively impacted the buoyancy of the coffer dam and made it unstable.  BP was thus unable to install the coffer dam to stem the flow of oil.

103.    On May 8, 2010, a BP engineering team developed the concept of the riser insertion tube tool ("RITT").  The purpose of the RITT was to collect some of the oil escaping from the broken end of the riser and siphon it to a relief vessel.

104.    On May 15, 2010, BP installed the RITT in the end of the riser.

<u>The Riser Insertion Tube Tool</u>



105.    One of the first ideas that BP had with respect to stopping the oil spill was to pump drilling mud and debris down through the top of the well to counter the hydrocarbons rising up through the well.  These procedures were referred to as the "top kill" and "junk shot" procedures.

106.    On May 26, 2010, BP commenced the top kill procedure by pumping heavy drilling mud into the well through the blowout preventer's choke and kill lines.  BP also attempted the junk shot by injecting objects such as golf balls and pieces of rubber into the blowout preventer.

107.    The *New York Times* provided the following schematic of how the top kill and junk shot were supposed to work:

Top Kill and Junk Shot



108.    Between May 26 and May 28, 2010, BP made six attempts at the top kill and junk shot procedures.

109.    On May 29, 2010, BP announced that the top kill and junk shot methods had been unsuccessful in stopping the oil spill.

110.    The next step that BP took was a "top hat" procedure.  This procedure required cutting the riser at the top of the blowout preventer stack and placing a dome, or "top hat," on the lower marine riser package to collect as much of the escaping oil as possible.

111.    On June 3, 2010, BP severed the riser just above the lower marine riser package to isolate the source of the oil leak.

112.    In the days that followed, BP installed the top hat over the lower marine riser package to capture some of the oil escaping from the severed riser.

113.    The *New York Times* provided the following schematic of the top hat procedure:

<u>Top Hat</u>

**J.**     **The Oil Leak is Finally Stopped**

114.     On July 10, 2010, the top hat was removed so that it could be replaced with a capping stack that would capture more oil and potentially fully close the well.

115.     The capping stack was put in place on July 12, 2010.

116.     The *New York Times* provided the follow schematic of the capping stack procedure:

Capping Stack



117.     On July 14, 2010, the capping stack's middle ram was closed, diverting flow to the capping stack's choke and kill outlets.

118.    On July 15, 2010, the capping stack's kill and choke side outlets were closed, and the Macondo well was shut in at approximately 2:24 p.m.

119.    At that time, oil had been spilling into the Gulf of Mexico for 86 days.

120.    On August 3, 2010, BP commenced the static kill of the Macondo well by pumping drilling mud through the blowout preventer.  On August 6, 2010, BP confirmed that the cement plug had been put in place properly.

121.    The blowout preventer and the capping stack were removed from the Macondo well on September 2, 2010.

**K.      The Worst Environmental Disaster in United States History**

122.    The Macondo blowout produced the largest marine oil spill in United States history.  Its impact on the environment, the economy, and human health was devastating.

123.    From an environmental perspective, the Macondo blowout severely damaged a rich, productive marine ecosystem.  Animals impacted by the disaster include sperm whales, sharks, hundreds of species of fish, dozens of bird species, shrimp, jellyfish, sea turtles and dolphins.  The oil spill also damaged the Gulf of Mexico's coastal wetlands.

124.    From an economic perspective, the Macondo blowout had a huge impact on the Gulf Coast's tourism and fishing industries.  Public perception that fish and shrimp from the Gulf were contaminated and that beaches were polluted crippled these industries in a way from which they may never recover.

125.    From a human health standpoint, in addition to the eleven lives that were lost and the multiple injuries that crew members sustained as a result of the explosion on the Deepwater Horizon, the psychological harm and physical ailments that have been inflicted by the oil spill on the residents of the Gulf of Mexico are immeasurable.

## II.   BP's Alarming Internal Flow Rate Estimates

126.   Immediately after the Deepwater Horizon blowout, BP mobilized its vast resources to determine the amount of oil spilling into the Gulf of Mexico.   According to Defendant Hayward, "[a]t the peak, there were almost a thousand engineers and scientists operating" at BP's Incident Command Center in Houston.

127.   BP's engineers and scientists had unlimited resources to determine flow rate. They had access to proprietary data regarding the Macondo reservoir, the infrastructure of the well, and the pressure logged by the drilling team at the well.   BP also had information obtained from other nearby wells it had previously drilled.

128.   To generate flow rates, BP's engineers and scientists entered this proprietary data into sophisticated computer software designed to measure oil spills.

129.   BP's engineers and scientists modeling the flow rate, along with the BP contractors assisting those engineers and scientists, were organized into four informal workgroups:  (1) the Reservoir Engineer Group; (2) the Hydraulic Kill Engineer Group; (3) the Petroleum Engineer Group; and (4) the Flow-Assurance Engineer Group.

130.   These workgroups communicated their results to BP's senior management in meetings, via email, and through PowerPoint presentations.

131.   Shortly after the blowout, BP executives started holding twice-daily "Daily Interface Meetings."   Defendant Suttles was listed as a participant in these meetings.   Among the topics on the recurring agenda at these meetings was "Integrity & Flow Analysis."

132.   To model the oil, the BP engineers and scientists applied certain variables based on data concerning the well infrastructure and drilling.   These variables included:  the flow path of the oil through the well (i.e., whether oil was flowing up the well through the annulus, through the casing, or through both the annulus and the casing); the existence of any choke in the

blowout preventer or the riser (the "shallow-choke orifice"); the conditions where the well met the reservoir (the "skin"); and the thickness, permeability and productivity of the reservoir from which hydrocarbons were flowing.

133.    On April 21, 2010, within hours of the Deepwater Horizon explosion, Kurt Mix, a BP engineer in the Hydraulic Kill Engineer Group, began modeling the potential flow rate from the leaking Macondo well.  He emailed his findings to his supervisor on April 22, 2010.  Mix's models resulted in flow rates of between *93,000* and *138,300* barrels per day if oil was flowing up the well casing, and *64,000* barrels per day if oil was flowing up the well annulus.  These models did not assume that there was no blowout preventer or no equipment on the well.

134.    Also, on April 21, 2010, a BP engineer in the Reservoir Engineer Group emailed Rainey and other BP executives a "worst case scenario" of *100,000* barrels per day.

135.    On April 22, 2010, another BP engineer in the Reservoir Engineer Group created a forecast of future well flow rates starting at *100,000* barrels per day and decreasing gradually over time.

136.    On April 28, 2010, the Flow-Assurance Engineer Group provided a memorandum on flow rate at the request of Inglis and another BP executive.  The Flow-Assurance Engineer Group's model provided flow rates ranging up to *65,171* barrels per day depending on the size of the shallow-choke orifice.  These ranges, however, assumed an additional choke at the bottom of the well (a "deep choke") that would have decreased the amount of oil flowing from the reservoir.

137.    The Flow-Assurance Engineer Group's subsequent models used flows rates ranging from a few thousand barrels per day to *48,173* barrels per day.  By mid-May, the Flow-Assurance Engineer Group had discounted the lower values as inconsistent with video evidence.

Specifically, the lower values modeled by the Flow-Assurance Engineer Group required an assumption that the well was experiencing periodic reverse flow.  However, the Flow-Assurance Engineer Group had not observed any periodic reverse flow when reviewing the video of the plume of oil coming out of the riser.

138.    On April 29, 2010, a contractor working for the Hydraulic Kill Engineer Group circulated a PowerPoint presentation modeling various cases.  One scenario, which assumed oil flowing through the casing in the well, yielded a flow rate of *146,000* barrels per day.  Another scenario, which assumed oil flowing through the casing but restricted by a drill string, yielded a flow rate of *77,000* barrels per day.  Another scenario, which assumed oil flowing through the well annulus, yielded a flow rate of *69,500* barrels per day. Another scenario, which assumed oil flowing through the well annulus but with a kink in the riser, yielded flow rates ranging up to *60,500* barrels per day depending on the size of the shallow-choke orifice.

139.    In early May 2010, the Petroleum Engineer Group performed extensive scenario modeling to determine flow rates.  The flow rates determined by the Petroleum Engineer Group ranged as high as *95,336* barrels per day, which assumed casing and annular flow, a skin of 0 (i.e., that the bottom of the well was connected to the reservoir), and no choke.

140.    Around May 5, 2010, Defendant Hayward and BP executive Inglis requested that the Reservoir Engineer Group produce a chart of worst case discharge plots based on various flow rate restrictions.  The chart produced by the Reservoir Engineer Group depicted flow rates of 5,000, 10,000, *20,000, 55,000, 109,000* and *162,000* barrels of oil per day.  The conditions in the chart for achieving a flow rate of 5,000 and 10,000 barrels per day were unlikely, however, because they assumed a very narrow shallow-choke orifice.  Specifically, these flow rates assumed a shallow-choke orifice of 0.355 and 0.52 inches, respectively.   The riser was

approximately 19 inches in diameter.  Therefore, even if there was a kink in the riser, the orifice through which oil could still escape would have been wider than half an inch in diameter.

141.    The next day, Inglis's executive assistant asked an engineer from the Reservoir Engineer Group to "run two more cases; with initial flow rates of **40,000** and **60,000**" barrels per day.

142.    On May 9, 2010, the Hydraulic Kill Engineer Group presented a chart of flow rates ranging from **37,000** barrels of oil per day (assuming that oil was flowing up the well through the annulus, but not the casing, and that there were obstructions in the blowout preventer and/or riser) to **87,000** barrels of oil per day (assuming that oil was flowing up the well through both the annulus and the casing and that there were no obstructions in the blowout preventer or riser).

143.    On May 10, 2010, a contractor working for the Hydraulic Kill Engineer Group sent an email to Kurt Mix with the subject, "Current flow out of riser."  The contractor apparently had been shown a video of the source of the oil spill, and responded:  "Kurt, based on the video you shoved [*sic*] me Yesterday . . . I do not think it can be ruled out that the flow out at seabed is in the order of **40 000 bopd**."

144.    On May 11, 2010, the Petroleum Engineer Group summarized their scenario modeling in a PowerPoint presentation for Inglis.  The presentation presented ranges that varied based on whether the reservoir exposure was 88 feet or 44 feet.  The PowerPoint presentation that Inglis received from the Petroleum Engineer Group contained flow rates ranging from **14,000** barrels of oil per day to **96,000** barrels of oil per day.

145.    The May 11, 2010 Petroleum Engineer Group presentation to Inglis also contained a slide called "The Case for 5000 BOPD at 3800 psi."  The 3800 psi figure was the

pressure that had been measured at the bottom of the blowout preventer. The slide indicated that a flow rate of 5,000 barrels of oil per day could only be achieved at 3800 psi by using aggressive parameters that were not consistent with the parameters used on the prior slides that yielded flow rates ranging from *14,000* to *82,000* barrels of oil per day, and also were not consistent with what BP knew about the conditions at the well. On May 15, 2010, the Petroleum Engineer Group had to revise these estimates because the psi at the bottom of the blowout preventer dropped from 3800 psi to 3100 psi (indicating an increase in the flow rate). The Petroleum Engineer Group had to employ even more aggressive, and even more unlikely, parameters in order to justify "The Case for 5000 BOPD."

146.    In addition to the four BP workgroups, BP's contractor, Halliburton, performed computer modelling of the flow rate in order to design the cement job for BP's top kill effort. In or around May 21, 2010, BP told Halliburton to use a 5,000-barrels-of-oil-per-day flow rate in its modeling. However, Halliburton determined that a 5,000-barrels-of-oil-per-day flow rate was not conceivable given the temperature readings it was obtaining from the blowout preventer. The minimum flow rate that Halliburton could model based on the temperature readings it had received was *30,000* barrels of oil per day. BP gave Halliburton the go ahead to use 30,000 barrels of oil per day as the input for its model.

147.    In sum, all of BP's internal scientific modeling from April 22 onward, as well as the modeling it received from its contractors, showed that the flow rate of oil leaking from the Macondo well was extremely high. However, as explained in more detail below, BP and its executives deliberately misled the public about the flow rate in order to understate the severity of the oil spill.

III.   **BP Intentionally Misrepresents the Flow Rate to the Public in Order to Downplay the Magnitude of the Gulf Oil Disaster**

148.   As oil began billowing into the Gulf of Mexico, BP's reflex was not to admit its mistakes and the harm it had caused and was continuing to cause, but rather to try and limit the damage to its reputation and its business.  It did so by, among other things, making public statements disclaiming responsibility for the blowout and drastically understating the extent of the oil spill.

149.   In the days and weeks following the Macondo blowout, BP and its executives held joint press conferences with the federal government, appeared on TV shows for interviews, made public filings with the SEC, and appeared before Congress.

150.   The flow rates that BP publicly disclosed during these events were significantly lower than the actual flow rates that BP calculated internally based on its use of sophisticated computer models and superior data.  When BP's own engineers questioned these public statements, they were instructed not to disclose BP's internal calculations.

151.   BP intentionally misrepresented the oil spill flow rate to the public to try and avoid the harm it would suffer if the truth were revealed.

152.   Commencing on April 24, 2010, the Unified Area Command and BP began hosting several joint press conferences to brief the public on, among other things, the amount of oil spilling into the Gulf.

153.   On April 24, 2010, the Unified Area Command and BP held a joint press conference where they revealed that the Deepwater Horizon rig had been located on the ocean floor and that oil was leaking from the riser still attached to the well.  Defendant Suttles spoke on behalf of BP at the joint press conference.  BP and the Coast Guard announced during the press conference that they had detected ongoing releases of oil from the Macondo well at a rate of

approximately 1,000 barrels per day.  Admiral Landry stated:  "***It's 1,000 barrels*** emanating from 5,000 feet below the surface."  Defendant Suttles failed to correct Admiral Landry's statement.

154.   On April 25, 2010, Unified Area Command and BP held another joint press conference.  Admiral Landry repeated no fewer than four times during that press conference that the flow rate was 1,000 barrels of oil per day.

155.   Not only did Suttles, who stood by Admiral Landry's side during the press conference, not correct Admiral Landry's flow rate announcement, he agreed with it and employed superlatives to stress what a small amount of oil – in BP's view – 1,000 barrels per day represented.  When asked by a reporter to describe what 1,000 barrels per day looked like, Suttles responded:

> The rate we are seeing today is ***considerably lower, considerably lower***, than what was occurring when you saw the rig on fire.  As a sense of reference, ***this is many, many, many times smaller*** than that.  . . .  ***This is a long way away from something more significant***.

156.   In trying to disabuse the public that there was an open flow of oil into the Gulf, Suttles stated:

> ***There are many, many restrictions in this flow*** as it's coming out and that's why ***the rate is much lower than it was before***.

157.   Landry concluded the press conference by telling the audience that, "[i]f there's any change in what we estimate to be 1,000 barrels per day, we will apprise you."  Suttles nodded in agreement as Landry made that statement.

158.   BP already knew at that point, based on its internal modeling, that the flow rate was much higher than 1,000 barrels per day.  However, BP did not correct the 1,000-barrels-per-day estimate because it wanted to downplay the severity of the oil spill.

159.    On April 28, 2010, Unified Area Command and BP held another joint press conference.  Admiral Landry began the conference by stating that BP had informed her that there was an additional leak in the riser.  While BP believed the flow rate was 1,000 barrels per day, the National Oceanic and Atmospheric Administration ("NOAA") scientists now believed that the flow rate could be as high as 5,000 barrels per day.

160.    Suttles initially told the public that BP's discovery of a new leak in the riser did not change BP's flow rate estimate of 1,000 barrels per day.  However, when pressed about the discrepancy between BP's flow rate estimate and the NOAA's, Suttles stated:  "I do not disagree with the Admiral's estimate that it could be 5,000 barrels a day, it's clearly within the range of uncertainty . . . ."  Thus, on April 28, 2010, BP represented to the public that oil was flowing from the Macondo well at *a range of 1,000 to 5,000 barrels per day*.

161.    At this point, BP had the benefit of several internal models showing flow rates far in excess of 5,000 barrels of oil per day.   Indeed, one internal BP scientific estimate yielded 65,171 barrels per day, even assuming multiple restrictions in the flow path.

162.    Nevertheless, on April 29, 2010, Suttles appeared on the three major network morning shows to further mislead the public about the flow rate.

163.    On the Early Show on CBS, Suttles told anchor Maggie Rodriguez that "*somewhere between one and five thousand barrels a day is probably the best estimate we have today.*"

164.    On NBC's *Today Show*, Suttles told host Matt Lauer that, "I would say *the range is one to 5,000 barrels a day*."

165.    On ABC's Good Morning America, Suttles told Robin Roberts that, "I think *between 1 and 5,000 barrels a day is a reasonable estimate*."

166.     BP also put its misrepresentations in writing.  BP p.l.c. made several public filings with the SEC in April and May 2010, providing updates on its response to the oil spill in which it lied about the flow rate.

167.     On April 29, 2010, BP filed with the SEC its Form 6-K for the period ended March 31, 2010.  In the section on "Exploration and Production," BP stated the following with respect to the Gulf Oil Disaster:

> On 20 April 2010, the semi-submersible drilling rig Deepwater Horizon owned and operated by Transocean Limited caught fire in the US Gulf of Mexico and subsequently sank.  The rig was drilling an exploration well (Mississippi Canyon 252) in which BP has a 65% interest. As operator under the MC 252 lease, BP is committed to doing everything in its power to contain the environmental consequences of the incident.  BP is currently ramping up preparations for a major cleaning effort on the shorelines of Louisiana, Mississippi, Alabama and Florida. ***Efforts continue to stem the flow of oil from the well, currently estimated at up to 5,000 barrels a day***. Preliminary estimates indicate that current efforts to contain the spill and secure the well are costing the MC 252 owners about $6 million per day. This figure is expected to rise as activity increases. It is too early to quantify other potential costs and liabilities associated with the incident.

168.     On April 30, 2010, BP stated in an SEC filing that the flow of oil from the Macondo well was "***currently estimated at up to 5,000 barrels a day***."  This statement was repeated on BP's website that same day.

169.     BP provided that same estimate in another public filing four days later, adopting the flow rate estimate of the NOAA:  "[C]urrent estimates by the US National Oceanic and Atmospheric Administration (NOAA) suggest that ***some 5,000 barrels (210,000 US Gallons) of oil per day are escaping from the well***."

170.     BP so desperately wanted to publicly downplay the severity of the Gulf Oil Disaster that it was willing to risk incurring criminal penalties by lying to Congress about the flow rate.

171.    The United States House of Representatives Subcommittee on Energy and Environment (the "House Energy Subcommittee") had been delegated oversight over national energy policy and energy regulation by the House Committee on Energy and Commerce.  On April 30, the House Energy Subcommittee commenced an investigation into the Macondo blowout and oil spill.

172.    On May 4, 2010, BP executive Rainey appeared before the House Energy Subcommittee for a briefing.  During that briefing, Rainey falsely informed the members of the House Energy Subcommittee that 5,000 barrels per day was the most accurate flow rate estimate. Rainey further stated that BP had calculated a hypothetical "worst case" scenario of 60,000 barrels of oil per day, but that such a scenario was not possible because it assumed removal of the blowout preventer from the wellhead.  This was a lie, of course, because BP had calculated flow rates far in excess of 60,000 barrels per day that did not assume an open hole at the wellhead.

173.    On May 5, 2010, Defendant Hayward gave an interview to the *Houston Chronicle* from BP's North American headquarters in Houston, Texas.  While Hayward stated that the exact flow rate was unknown, he told the Houston Chronicle that BP's best estimate was 5,000 barrels of oil per day:  "*[T]he guestimate remains 5,000 barrels a day*."

174.    On May 5, 2010, Unified Area Command and BP conducted another press conference.  During that press conference, Suttles was asked about a *New York Times* report that summarized Rainey's statements to Congress.  In response, Suttles stated that there had "been some work done by BP which says if the actual [blowout] preventer and all of the equipment present were to be removed, the rate could go up to that rate.  Now, *clearly that's not the situation we have at the moment*, but it's not impossible."

175.     Suttles thus represented to the public that the only way that a flow rate of 60,000 barrels per day could occur was if there was no equipment on the wellhead and the well was left totally open, which was not the situation at the Macondo well and was never likely to happen. Thus, BP publicly dismissed 60,000 barrels per day as a purely hypothetical, fantastical flow rate.

176.     Also around May 5, 2010, after receiving the Reservoir Engineer Group's chart of worst case discharge plots based on various flow rate restrictions that showed flow rates of up to 162,000 barrels of oil per day, Inglis's executive assistant responded to the Reservoir Engineer Group: "**Both Tony [Inglis] and Andy [Hayward] have seen it** and are impressed with the fast turn-around**.** This is exactly what they asked for. ***This information is sensitive, so please do not forward***." BP was obsessed with maintaining control over its flow rates estimates because it was publicly reporting much lower estimates.

177.     The next day, Inglis's executive assistant asked an engineer from the Reservoir Engineer Group to "run two more cases; with initial flow rates of 40,000 and 60,000" barrels per day. In her reply to Inglis's assistant, the engineer from the Reservoir Engineer Group attached the Excel file of the flow rate scenarios "so you can edit freely."

178.     BP executives embraced that invitation. On May 10, 2010, Defendant Suttles sent a revised version of the chart to the U.S. Coast Guard showing only the 5,000-barrel-per-day estimate – which was edited to be misleadingly labeled as the "Most Likely Model" – and the 55,000-barrel-per-day estimate – which was edited to be misleadingly labeled as the "Worst case model." BP disclosed this information to the Coast Guard "in reliance on [the Coast Guard's] assurances that it will be kept confidential and that it will only be used for internal government

purposes." Thus, even though the "[w]orst case model" that BP submitted to the Coast Guard was not actually BP's worst-case model, BP still did not want that number released to the public.

179.    On May 14, 2010, Suttles again conducted interviews with the major network morning shows during which he made misstatements about flow rate.

180.    On ABC's *Good Morning America*, BP attempted to refute independent reports that the flow rate was much higher than 5,000 barrels per day:

> [W]hat we're focused on is, you know, stopping the flow and minimizing the impact. And since the beginning, we've said, you know, it's almost impossible to get a precise number, but ourselves and people from NOAA and others believe that ***something around 5,000*** – it's actually barrels a day – ***is the best estimate***.
>
> And we look at that – not only do we look at what's occurring on the seabed. We look at what's occurring on the surface. And, actually, we know that, on the good-weather days, when we can apply all of our tools, we can actually shrink the size of this spill.
>
> And those are the ways we actually think that ***that's probably a reasonable number***, but we know it's highly uncertain.

181.    On NBC's *Today Show*, when asked by presenter Ann Curry whether BP had underplayed the size of the leak, Suttles stated that the 5,000 number was "reasonable."

182.    Curry continued to press Suttles:

> CURRY:  Is it possible that you are actually leaking more than 5,000 barrels a day?  Yes or no?
>
> SUTTLES:  I think, Ann, it could be higher or lower.  ***I don't think it's wildly different*** but it could be . . . a bit above or below."

183.    Later in the day, an article appeared on CNN.com quoting BP executives Suttles and Dudley as standing by the 5,000-barrels-per-day flow rate despite contrary conclusions by independent scientists:

> ***BP has said since the April 20 explosion of the Deepwater Horizon drill rig that about 5,000 barrels -- or 210,000 gallons-- have been pouring out of the well a day***.  The company says it

reached that number using data, satellite images and consultation with the Coast Guard and the National Oceanic and Atmospheric Administration.

*"I think that's a good range,"* Suttles said Friday.

But a researcher at Purdue University said BP's estimate is low. Associate Professor Steve Wereley said that about 70,000 barrels of oil are leaking each day, based on an analysis of video of the spill.

"You can't say with precision, but you can see there's definitely more coming out of that pipe than people thought," he said. "It's definitely not 5,000 barrels a day."

A BP executive rejected that assertion Friday.

"***Well, that's not what our experts, multiple experts***, not only from BP, and the industry ***say***," said Bob Dudley, BP managing director for the Americas and Asia. "This crude is what's called a light-sweet crude. It has lots of gas and when it comes out, it expands very rapidly, a little bit like bubbles in a soda pop. So ***it's very difficult to look at it and say that the volume will be much higher***. We certainly don't see that at the surface."

184.   Mike Mason, a BP senior engineer, saw the statements attributed to Suttles and Dudley in the CNN article. In response, Mason felt compelled to write the following email to Inglis:

> I just read an article in CNN (May 14, 2010 1:00pm) stating that a researcher at Purdue believes that the Macondo well is leaking up to 70,000bopd and that BP stands by a 5,000bopd figure. With the data and knowledge we currently have available we can not definitively state the oil rate from this well. ***We should be cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~ 100,000 bopd*** depending on a number of unknown variables, such as: flow path either through the annulus behind the production casing or through the production casing float shoe, the height of reservoir exposed, if drill pipe is suspended in the BOP and sealed by VBR rams, reservoir skin damage, choking effects and etcetera. We can make the case for 5,000bopd only based on certain assumptions and in the absence of other information, such as a well test.

185.    This email was forwarded to BP's upper management, including Suttles and Rainey.  Neither Inglis, Suttles, nor Rainey, however, did anything in response to Mason's protestations to correct BP's inaccurate and misleading public flow rate statements.

186.    In fact, shortly after sending his email, Mason received a call from Inglis's executive assistant requesting an immediate meeting that morning.  At that meeting Mason was told:  "Next time you have an idea or a thought like this e-mail note, we would appreciate it you would walk over and discuss with us."  When Mason asked what the problem with his email was, he was told:  "***It's the big number***."  Other BP engineers have testified in depositions that they too were told not to put their flow rate estimates in writing.

187.    Mason was not the only BP engineer to express concern with BP executives' public statements.  On May 16, 2010, a contractor working for the Hydraulic Kill Engineer Group emailed the Flow-Assurance Engineer Group concerning the top kill effort.  The contractor stated in his email:  "Be aware we are working on the 5000 BOPD case.  That could be too optimistic."  The Flow-Assurance Engineer Group then sent an internal email stating, "[t]he apparent reliance in [the contractor]'s email on the [5,000 barrels of oil per day] number, ***which has little if no origin***, is ***concerning.***  From all the different ways we have looked at flow rate, [5,000 barrels of oil per day] would appear to ***err on the low side***."

188.    On May 17, 2010, Unified Area Command and BP conducted another press conference during which Suttles spoke about BP's use of the riser insertion tube tool to capture oil flowing through the riser.  Suttles told reporters that BP would be "extraordinarily pleased" if the RITT captures "as much as half or more of the total flow" of oil, which would be "in excess of 2,000 barrels a day."  In a follow up question, Suttles was asked whether this statement meant

he was certain that the flow rate was actually 5,000 barrels per day.   Suttles responded that "***that's our best estimate today***."  BP's best estimate, however, far exceed 5,000 barrels per day.

189.   Suttles also discussed during that press conference BP's plans to use the top kill and junk shot methods to stop the oil spill.  Suttles indicated that the top kill could bring an end to the oil spill within a week:  "Our next effort to try to stop the flow will occur late this week or early in the weekend coming up, and it's the top kill procedure . . . . If that's successful, we would be bringing this incident to a close."

190.   On May 18, Defendant Hayward continued to downplay the severity of the oil spill, telling Sky News:

> ***I think the environmental impact of this disaster is likely to be very, very modest***. It is impossible to say and we will mount, as part of the aftermath, a very detailed environmental assessment as we go forward. We're going to do that with some of the science institutions in the U.S. But ***everything we can see at the moment suggests that the overall environmental impact of this will be very, very modest***.

191.   On May 19, the House Committee on Transportation and Infrastructure held a public hearing called: "Deepwater Horizon: Oil Spill Prevention and Response Measures and Natural Resource Impacts."   Several government officials and members of the public were invited to speak, including BP executive McKay.

192.   During the hearing McKay was asked:   "[I]s 5,000 barrels per day the most accurate, or is it something more than that?" McKay responded:  "***That is our best estimate***."

193.   Later on in the hearing McKay was asked by Representative Laura Richardson of California about the higher estimates being mentioned by people outside of BP:

> RICHARDSON:   Thank you. Why is there a disagreement between the total amount of oil that is leaking?  BP has said 5,000, other reports are saying otherwise.  Why do you think there is a disagreement, and do you stand by your point that it is only 5,000?

> MCKAY: I think there are a range of estimates and it is impossible to measure. That is the reality. What we have been doing with government officials, government experts, industry experts, is trying to come up with the best estimate, and that has been done essentially by understanding what is happening at the surface and trying to understand volume there, adding to it what we believe the oil properties, how it would disperse in a water column as it moves to the surface. And those two added together is the estimated volume. It has been clear from day one there is a large uncertainty range around that.
>
> RICHARDSON: Is it possible it could possibly be the larger number that has been reported?
>
> MCKAY: It is theoretically possible. I don't think anyone believes it is quite that high that has been working on this. *I believe the uncertainty range is around that 5,000 number*, and it could be higher. *But if the number you are talking about is 70,000 barrels a day,* I don't know this, but *I don't think people that are working with it believe that that is a possibility*.

194.    On May 21, 2010, Suttles appeared on *Good Morning America* for a third time. By this time, BP's 5,000-barrels-per-day public estimate was coming under increased scrutiny. Robin Roberts asked Suttles if BP had deliberately underestimated the size of the spill and misled the public. Suttles responded:

> Robin, you know, from the beginning, we've worked with the government on this estimate. In fact, I should actually point out that the 5,000 barrels a day – which we've stated since the beginning – obviously, has a lot of uncertainty. That was not just BP's estimate. That was the estimate of the unified command, including NOAA and the Coast Guard.
>
> *And that's the best estimate we have*. We can't put a meter on this thing. We can see what you can see. We can see what's on the surface.

195.    During a joint press conference on May 21, 2010, Suttles was asked about the effectiveness of the top kill method with respect to the flow rate: "[I]f you don't know the flow rate that's coming from the leak," the reporter asked, "then how do you know how much material

you need to use and at what pressure and what rate you need to jam the well shut using the top kill technique?"

196.    Suttles provided the following response:   "[W]e have done analysis since the beginning about what we believe the rate is and we've talked about that on numerous times.   And we've said since quite early on in this that *our best estimate was somewhere around 5,000 barrels* a day but with a wide range. . . .   So at the moment, *that's our best estimate*."

197.    On May 22, 2010, Suttles appeared on NPR's *Weekend Edition* with Scott Simon. The following colloquy occurred:

> SIMON:  And how much oil is billowing into the Gulf right now?
>
> SUTTLES: Well, Scott, I precisely don't know.   We've been trying to estimate the flow since very early on in the spill, and when I say we, it's actually BP, NOAA, the Coast Guard and others.   We can monitor what comes out of that pipe, but that's visual.   It's very difficult to measure that.   There's no meter.   But what we can also do is actually look at the expression of it on the surface, 'cause we can use aerial techniques to try to map how much oil is there and then see how much we collect or burn and the other techniques and look at that difference.   And those are the techniques we use to give an estimate, *and 5,000 barrels a day was the best estimate we could do*, but we've also stressed since the beginning that that number is very uncertain because we can't meter it.
>
> SIMON: Now, *you know there's independent scientists who've made their own estimates at NPR's request, and they've come up with a substantially higher figure than 5,000.  They say as much as 70,000 barrels a day*.
>
> SUTTLES: *I've heard those estimates and seen them and I don't believe it's possible that it's anywhere near that number*.   Of course, I can't - since I can't meter it, I can't actually say it couldn't be.   But all of our techniques would say that that's highly unlikely.   And I think some of the reasons these estimates may not be able to accurately calculate is there's a large volume of gas coming out of the end of that pipe with the oil.
>
> And in addition to that, we, particularly over the last few days, when we've had very good weather, we've actually seen the size of

the spill and the amount of oil on the surface go down. So those are the things that lead me to believe that *those estimates are way too high*.

SIMON: What I'm trying to understand is if, and I will split the difference, *but let's say that it's 30,000 barrels a day that are spilling* - if you try to top kill, as I guess it's called, seal the leak, cap it off, do you risk using a technique that could make the spill even worse?

198.    SUTTLES: No, I don't believe that's the case, Scott, and *we don't think the rate's anywhere near that high*.

199.    On or about May 14, 2010, the House Energy Subcommittee had sent a letter to BP accusing it of understating the flow rate.  The letter was signed by the Chairman of the Subcommittee, Representative (now Senator) Edward Markey from Massachusetts.  The House Energy Subcommittee had requested answers to fifteen questions regarding the flow rate. Rainey had received the House Energy Subcommittee's request on or about May 21, 2010. Rainey began preparing a response to the House Energy Subcommittee's request.  At that time, Rainey was in possession of information provided by BP scientists and engineers, described more fully above, that contradicted a flow rate "best estimate" of 5,000 barrels per day.

200.    BP submitted its response to Chairman Markey on May 24, 2010.   In that response, BP stated:  "The range varies from about 1,000 barrels per day to roughly 15,000 barrels per day, *with a best scientific guess of roughly 5,000 barrels per day* . . . ."

201.    Attached to BP's May 24, 2010 response was a memo that Rainey had prepared attempting to refute the Purdue professor's 70,000-barrel-per-day flow rate estimate.   In that memo, Rainey stated that BP's *best guess of the flow rate was between 5,000 barrels and 6,000 barrels* per day.  The memo failed to mention, however, that Rainey had reversed engineered this number by taking the public estimate of 5,000 barrels per day and using information from

-48-

Wikipedia.  At the end of the memo, Rainey stated that, based on video of the source, "*the flow must be relatively minor*."

202.    All of these public statements by BP about the flow rate were completely out of line with BP's internal numbers, which were created by BP's engineers and scientists using sophisticated computer software and proprietary well data known only to BP and its contractors. When BP's executives were confronted with these alarming flow rates, however, rather than disclose the truth to the public, they issued strict instructions to BP employees to keep the flow rates confidential and not to disclose them externally so BP could continue to perpetuate the myth that the oil spill was insignificant

203.    The evidence of BP's internal estimates and BP's public statements about flow rate was reviewed and analyzed by Dr. John Wilson in the matter *In re: Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010*, MDL No. 2179 (E.D. La.).  Dr. Wilson is an engineer specializing in fluid flow and related transport processes, with special attention to flow in porous media and the science of hydrogeology.  Dr. Wilson has a PhD in engineering from MIT.

204.    After reviewing the foregoing evidence, Dr. Wilson concluded:  "None of the modeling and testimony I have reviewed supports the contention that 5,000 BOPD would be a 'most likely' or best estimate of flow."

205.    Dr. Wilson's conclusion was essentially accepted by the United States District Court for the Eastern District of Louisiana when it concluded in its post-trial findings of fact: "*There is no dispute that BP lied about the amount of oil that flowed from the well*.  The evidence shows that BP repeatedly told government officials that its best estimate for flow rate was 5,000 barrels of oil per day, which BP's internal documents showed *there was little basis for*

*this estimate and actual flow rates were significantly higher*."  *United States v. BP Exploration & Production, Inc.*, No. MDL 2179 Section J, slip op. at 32 (E.D. La. Jan. 15, 2015).

## IV.    The Truth Gradually Emerges

206.    Throughout April and May 2010, BP continuously told the public that the flow rate was around 1,000 or 5,000 barrels of oil per day, and that the spill was much less severe that it actually was.

207.    However, the truth about the scope of the oil spill and flow rate began to emerge in bits and pieces starting on April 29, 2010.  By June 15, 2010, the public was fully aware that BP had severely understated the flow rate.  On August 2, 2010, an independent group of government and university scientists revealed the actual flow rate.

208.    On April 29, 2010, the Secretary of the Department of Homeland Security, Janet Napolitano, stated during a White House press briefing that she would be designating the spill as a "spill of national significance."  During that same press conference, Rear Admiral Sally Brice-O'Hara of the U.S. Coast Guard announced that the Coast Guard expected the oil spill to reach land by the following day.  Shortly thereafter, Governor Bobby Jindal declared a state of emergency for Louisiana due to the encroaching oil spill.

209.    These statements indicated that the flow rate of the oil spill was substantially higher than BP's public disclosures.

210.    Nevertheless, the total amount of oil flowing from the well was still unknown to the public.  BP continued to publicly downplay the severity of the oil spill.  Late in the day on April 29, 2010, and then again on April 30, 2010, BP filed public documents with the SEC stating that the oil spill was "currently estimated at up to 5,000 barrels a day."

211.    On May 1, 2010, a report from the Associated Press stated that an analysis of satellite images by the University of Miami indicated that the oil slick on the ocean's surface had

tripled in size over the previous two days.  Although the volume of oil could not be measured precisely by viewing satellite images, the increase in the size of the slick, according to experts interviewed by the Associated Press, could indicate an increase in the flow rate.

212.    Also on May 1, 2010, the White House suddenly announced that President Obama would be flying down to Louisiana the following day to visit the potentially affected areas.  On May 2, 2010, the President remarked from Louisiana that the country was dealing with "a massive and potentially unprecedented environmental disaster. The oil that is still leaking from the well could seriously damage the economy and the environment of our Gulf States and it could extend for a long time.  It could jeopardize the livelihoods of thousands of Americans who call this place home."

213.    These statements indicated that BP was not being forthright about the amount of oil flowing from the well and the extent of the oil spill.

214.    Nevertheless, the total amount of oil flowing from the well was still unknown to the public.  BP continued to publicly downplay the severity of the oil spill.  For example, on May 5, 2010, Defendant Suttles was asked during a press conference whether it was possible that the flow rate could be as high as 60,000 barrels per day.  Suttles responded that BP believed that that could be the case only "if the actual [blowout] preventer and all of the equipment present were to be removed."  He then stated, "clearly that's not the situation we have at the moment."

215.    On Saturday, May 8, 2010, BP's attempt to stop the oil spill with a giant coffer dam failed.  The *Wall Street Journal* reported that the coffer dam was destabilized by the large amount of hydrates it encountered, which were caused by the oil leak, when being lowered onto the well.  Thus, there was apparently more oil leaking from the well than BP had previously disclosed.

216.    Also, on May 8, 2010, the *Associated Press* reported that tar balls believed to be from the oil spill had washed ashore in Alabama.  These tar balls indicated that the oil spill had reached further east than expected.  However, the true flow rate was still not known to those outside of BP.

217.    On May 9, 2010, the *Telegraph* reported that Defendant Hayward had stated during an interview that BP could be spending as much as $10 million per day on clean-up costs, which was a significant increase over the $6-million-per-day figure BP had previously disclosed. The increase in costs indicated that the oil spill was larger than BP was letting on.

218.    However, BP continued to downplay the severity of the oil spill, even as public scrutiny over its 5,000-barrels-per-day estimate intensified.  For example, on May 22, 2010, in response to a question about whether the flow rate could be as high as 30,000 barrels per day, Suttles told NPR:  "[W]e don't think the rate's anywhere near that high."

219.    On May 24, 2010, several news sources, including the *Guardian*, reported that: (1) the total cost of the oil spill to BP had risen to $760 million, up $135 million (or 22%) from BP's May 18, 2010 estimate; (2) according to the U.S. Coast Guard, more than sixty-five miles of the Gulf coast had been hit by oil; (3) the RITT was not collecting as much oil as previously estimated; and (4) BP was facing increased pressure from the President to stop the oil spill.  All of these events indicated that the severity of the spill was increasing beyond what BP was telling the public.  However, these statements were only a partial disclosure of the truth.

220.    On May 26, 2010, BP commenced the top kill and junk shot procedures, which it had indicated would completely stop the oil spill if successful.  In order for the top kill to work, BP needed to pump enough drilling mud into the well to push back the oil flowing out of the well.  If the top kill alone was insufficient, BP intended to shoot debris (consisting of, among

other things, diapers and golf balls) into the well to obstruct the oil's flow and to try and reduce the amount of oil that was escaping.  In preparation for the top kill operation, BP had prepared a memorandum stating that the procedure would not succeed if the flow rate was higher than 15,000 barrels of oil per day.

221.    On May 29, 2010, several news outlets reported that the top kill and junk shot operation had failed.  This failure indicated that the flow rate was higher than BP was publicly disclosing.  If the rate were anywhere close to 5,000 barrels of oils per day, the top kill and junk shot should have worked.

222.    On May 30, 2010, Representative Markey of the House Energy Subcommittee appeared on CBS's *Face the Nation* and stated that, based on internal documents he had received from BP, BP's initial estimates of oil gushing into the Gulf of Mexico from the Macondo well were larger than what BP had publicly stated the flow rate was.  Representative Markey explained to John Dickerson that BP had misstated the oil flow rate to avoid government fines:

> "BP has a stake in their own liability here.  That means that the fine which can be imposed upon them is dependent upon how many barrels per day is going out into the Gulf.  If it's 1,000 barrels per day, it's a relatively low fine, but if it's 10,000, 15,000, 20,000 barrels per day, it could wind up billions of dollars in fines that BP executives have to pay to the federal government."

223.    Thus, the public was made aware at this time that the flow rate might be as high as 20,000 barrels per day.

224.    On June 9, 2010, political pressure mounted on BP to make sure it had enough reserves to cover the costs of the oil spill.  According to the *Associated Press,* BP was considering suspending payment of its quarterly dividend to cover the cost of the oil spill. Indeed, a group of thirty members of the U.S. House of Representatives sent an open letter to Defendant Hayward asking him to concentrate BP's resources on spill containment and clean up,

rather than on paying shareholder dividends and on a public relations campaign designed to limit the damage to BP's image. The news that BP may have to suspend its dividend to meet the clean up the costs of the oil spill indicated that the flow rate was much higher and that the spill was larger than BP was indicating, even more so than 20,000 barrels per day.

225.    On June 11, 2010, Rear Admiral James Watson wrote a scathing letter to BP, which was made public on June 12, 2010, criticizing the oil company for not having the capacity to deal with the oil spill. "It is clear that additional capacity is urgently needed," said Admiral Watson. "I am concerned that your current plans do not provide for maximum mobilization of resources to provide the needed collection capacity with the revised flow estimates [provided by the government]." The government had increased its estimate to up to 40,000 barrels per day.

226.    On June 12, 2010, ominous new signs that the Gulf Oil Disaster was worse than expected appeared as masses of oil washed ashore in Alabama. Previously, as noted above, tar balls had been found in Alabama. The pollution reported on June 12, 2010, by the *Associated Press* was significantly worse: "Waves of unsightly brown surf hit the shores in [Alabama], leaving stinking, dark piles of oil that dried in the hot sun and extended up to 12 feet from the water's edge for as far as the eye could see."

227.    On June 14, 2010, BP's board met to further consider suspending the dividend to pay for the cost of the oil spill. According to a *New York Times* source, the BP board discussed three options: "suspending payment of the dividend for two quarters, paying the dividend in bonus shares or escrowing the amount of the dividend while paying for the cleanup."

228.    The news between June 11 and June 14 put the market on notice that the flow rate could be 40,000 barrels per day or higher.

229.    To determine the true amount of oil spilling into the gulf, the federal government established the "Flow Rate Technical Group."   The Flow Rate Technical Group was comprised of respected and experienced scientists and engineers from government agencies and from various academic institutions.

230.    The Flow Rate Technical Group was divided into several sub-teams:

- The Plume Modeling Team observed video of the oil/gas mixture escaping from the Macondo well, using particle image velocimetry analysis to estimate fluid velocity and flow volume.

- The Mass Balance Team used remote sensing data from deployment of the Airborne Visible InfraRed Imaging Spectrometer and satellite imagery to calculate the amount of oil on the ocean surface on a certain day.  The team corrected the value for oil evaporated, skimmed, burned, and dispersed up to that day and divided by time to produce an average rate.

- The Reservoir Modeling Team studied the geologic formations as well as composition and pressures of the hydrocarbons that were being released.  Using openhole logs; pressure, volume, and temperature data; core samples; and analog well or reservoir data; the team used computer models to determine flow rate from targeted sands in the well as a function of bottomhole pressure.

- The Nodal Analysis Team used input from reservoir modeling (including pressure, temperature, fluid composition and properties over time) and pressure and temperature conditions at the leak points on the sea floor, along with details of the geometries of the well, the blowout preventer, and the riser to calculate fluid compositions, properties, and fluxes from both before and after removal of the riser.

231.    On August 2, 2010, the Flow Rate Technical Group released its final flow rate estimates.  At the outset of the spill, the flow rate was *62,000* barrels of oil per day (±10%), but the flow rate declined to *53,000* barrels of oil per day (±10%) by the time the Macondo well had been capped on July 14, 2010.  These flow rates were consistent with BP's internal modeling. The total amount of oil discharged during the spill was *4,928,100* barrels (± 10%, which gives a

range of 4,435,290 to 5,420,910 total barrels), a number not reduced by the amount of oil captured at the wellhead.

## V.  The DOJ's Criminal and the SEC's Civil Actions against BP and Certain BP Employees Relating to Flow Rate Misrepresentations

232.    Any lingering doubt that BP lied about the amount of oil spilling into the Gulf of Mexico is dispelled by the criminal and civil actions that the government has filed against BP and its executives, and the admissions that BP has made in response to those actions.

233.    On November 15, 2012, the Department of Justice ("DOJ") filed a criminal information against BP E&P containing eleven counts of criminal manslaughter, one count of violation of the Clean Water Act, one count of violation of Migratory Bird Treaty Act, and one count of obstruction of Congress.

234.    Simultaneously with the filing of the criminal information, BP E&P entered a written guilty plea to all fourteen counts.  BP E&P agreed to pay a total of $5.2 billion in criminal fines and recoveries and to a term of five years of probation.  BP E&P further agreed to a factual allocution attached as Exhibit A to the guilty plea.

235.    Among other admissions in the factual allocution, BP admitted that in its May 24, 2010 response to Chairman Markey of the House Energy Subcommittee it misled Congress about the flow rate of the Macondo oil spill by:

- Withholding "information and documents relating to multiple flow-rate estimates prepared by BP engineers that showed flow rates far higher than 5,000 BOPD, including as high as 96,000 BOPD."

- Withholding "information and documents relating to internal flow-rate estimates [Rainey] prepared  using [an] analysis that showed flow rates far higher than 5,000 BOPD, and that went as high as 92,000 BOPD."

- Falsely representing "that the flow-rate estimates included in the [May 24, 2010] Response were the product of [a]

generally-accepted . . . methodology.  At the time that this false representation was made, [Rainey] knew that those estimates were the product of a methodology he devised after, among other things, a review of a Wikipedia entry about oil spill estimation."

- Falsely representing "that the flow-rate estimates included in the [May 24, 2010] Response had played an 'important part' in the Unified Command's decision on April 28, 2010, to raise its own flow-rate estimate to 5,000 BOPD.  At the time this false representation was made, [Rainey] knew that those flow-rate estimates had not played 'an important part' in Unified Command's decision to raise its flow-rate estimate and had not even been distributed outside of BP prior to that decision."

- Falsely suggesting "in its May 24, 2010 letter, that the Unified Command's flow rate estimate of 5,000 barrels of oil per day was the 'most scientifically informed judgment' and that subsequent flow rate estimates had 'yielded consistent results.' In fact, . . . BP had multiple internal documents with flow rate estimates that were significantly greater than 5,000 BOPD that it did not share with Unified Command."

- Inserting "language [in a June 25, 2010 letter to Congress] that falsely stated that BP's worst case discharge estimate was raised from 60,000 BOPD to 100,000 BOPD after subsequent 'pressure data was obtained from the BOP stack.'  At the time this false representation was made, [Rainey] knew that the 100,000 BOPD figure was not first derived after subsequent pressure data had been obtained, but instead, he had been aware of a 100,000 BOPD worst case discharge since as early as on or about April 21, 2010."

236.    In addition to the criminal charges filed by the DOJ against BP E&P, a federal grand jury has issued criminal indictments against Rainey and Kurt Mix.

237.    The grand jury has indicted Rainey for obstruction of Congress on May 4 and May 24, 2010, and for making false statements to federal investigators on April 6, 2011.

238.    The criminal indictment against Rainey states, in pertinent part, the following allegations:

- Between April 26 and April 30, 2010, Rainey performed and caused to be performed daily estimates of flow rate that

resulted in "best guess" estimates significantly more than 5,000 barrels of oil per day and as high as 92,000 barrels of oil per day.

- Rainey knew that BP engineers and scientists were generating flow rates much higher than 5,000 barrels of oil per day.

- The memo Rainey created on May 17, 2010, to refute the non-BP estimates of flow rate intentionally omitted several pieces of material information showing that the flow rate was significantly higher than 5,000 barrels of oil per day.

- On May 19, 2010, Rainey was appointed as BP's liaison to the Flow Rate Technical Group, but failed to share with that group any of BP's estimates and modelling on flow rates.

- On May 4, 2010, Rainey falsely told Congress that (i) BP's most accurate flow rate was 5,000 barrels of oil per day, (ii) a flow rate of 60,000 barrels per day was the worst case scenario, and (iii) the worst case scenario of 60,000 barrels per day was not possible because it assumed removal of the blowout preventer from the wellhead.

- Rainey took the lead in preparing the BP May 24, 2010 letter response to Congress, in which BP lied about the flow rate and omitted BP's internal estimates of the flow rate.

- On April 6, 2011, Rainey lied to federal investigators when he told them that he had calculated a flow rate of 5,000 barrels per day prior to seeing the government's estimate of 5,000 barrels per day.

239. Rainey's criminal trial is set to commence on June 1, 2015.

240. The grand jury has indicted Kurt Mix for obstruction of justice because he deleted text messages concerning the flow rate from his cell phone. Specifically, Mix deleted the text messages concerning the Hydraulic Kill Engineer Group's flow rate estimates that were significantly higher than 5,000 barrels of oil per day and the Hydraulic Kill Engineer Group's concerns that the top kill method would not work because of the high flow rate.

241. On December 18, 2013, a federal petit jury found Mix guilty of obstruction of justice. However, a mistrial was ultimately declared because of juror misconduct and a new trial

was ordered.  The government's appeal of that decision is currently pending before the United States Court of Appeals for the Fifth Circuit.

242.    The SEC has also filed civil actions against BP and its former employees.

243.    On November 15, 2012, the SEC filed a civil action against BP p.l.c. for violations of Sections 10(b) and 13(a) of the Exchange Act in connection with BP p.l.c.'s Form 6-Ks filed on April 29, April 30, and May 4, 2010, which stated a flow rate of 5,000 barrels of oil per day.

244.    The SEC's basis for alleging that the statements concerning a flow rate of 5,000 barrels of oil per day were false were, among other things:

- "By April 22, 2010, a BP engineer had modeled possible oil flow path scenarios within the well, with corresponding rates between 64,000 bopd and 146,000 bopd."

- "On or before April 24, 2010, BP was aware of an estimate that showed that immediately following the explosion, oil was flowing through the still-attached riser at a rate of approximately 100,000 bopd."

- "By April 25, 2010, BP engineers were told of an external analysis of the oil on the water that reached the conclusion that the flow rate could be as high as 10,000 bopd."

- "On April 27, 2010, a BP engineer estimated the flow to be approximately 5,000 to 22,000 bopd on the basis of temperature readings along the riser pipe, among other factors."

- "On April 30, 2010, an analysis performed by a BP engineer yielded a range of possible flow rates from 5,000 bopd to 40,000 bopd."

- "In early May 2010, a video analysis by a BP engineer resulted in an estimate of 20,000 bopd, attributable to just the riser pipe."

- "On May 9, 2010, modeling done by a BP contractor led to a range of possible flow rates from 37,000 to 87,000 bopd."

- "On May 10, 2010, a video analysis done by a BP contractor led to the conclusion that for just oil leaking from the riser pipe, it could not be 'ruled out' that the flow rate was 'in the order of 40,000 bopd.'"

- "On or about May 10 and 11, 2010, reservoir modeling done by a BP engineer yielded a range of potential flow rate estimates from 14,000 bopd to 96,000 bopd."

- "On May 16, 2010, a reservoir-depletion/pressure-drop analysis done by a BP engineer yielded a flow rate calculation of 86,600 bopd, based on then-estimated pressure."

- "From May 19 to 20, 2010, a collection of a portion of the oil from the riser pipe with the Riser Insertion Tube Tool (the 'RITT') showed average collection rates of approximately 5,000 bopd for a 12-hour period, capturing a portion of the oil leaking from the riser, indicating that the total amount of oil was in excess of 5,000 bopd."

- "On May 23, 2010, an analysis created by a BP engineer of the flow rate attributable only to the flow coming from the 'kink' in the riser pipe showed an estimate of 11,600 bopd."

- "On May 24, 2010, the RITT collected approximately 6,100 barrels of oil during the 24-hour period from midnight to midnight, despite the fact that it was not collecting all of the oil emanating from the well."

245. According to the SEC complaint, both Rainey and Suttles were aware of many of the above-referenced pieces of information contradicting BP's estimated flow rate of 5,000 barrels of oil per day.

246. On the same day that the SEC filed its complaint, BP p.l.c. entered into a consent to a final judgment. BP p.l.c. agreed to be permanently enjoined from violating Section 10(b) and 13(a) of the Exchange act and to pay a civil penalty of $525 million. BP p.l.c. also agreed not to deny any of the allegations in the SEC's complaint.

247.    On April 17, 2014, the SEC filed a civil action alleging insider trading against Keith Seilhan, a former employee of BP p.l.c. for twenty years and a senior responder for BP during the Gulf Oil Disaster.

248.    According to the SEC's complaint, shortly after the oil rig sank, Seilhan was appointed an Incident Commander and On-Scene Coordinator at BP's Incident Command Center in Houma Louisiana.  Seilhan was tasked with coordinating BP's initial oil collection and clean-up operations.  In that capacity, Seilhan received nonpublic information relating to the scope of the oil spill, including BP's internal flow rate estimates.  Specifically, on April 22, 2010, Seilhan "received an email message from a BP manager commenting on worst case discharge estimates performed by BP engineers.  These worst case estimates, which were nonpublic, ranged from 64,000 bopd to 110,000 bopd, well in excess of BP's public flow rate estimates."

249.    On April 29 and 30, 2010, according to the SEC's complaint, Seilhan sold his entire $1 million portfolio of BP ADS.

250.    On the same day that the SEC filed its complaint, Seilhan entered into a consent to a final judgment.  Seilhan agreed to be permanently enjoined from violating Section 10(b) and 17(a) of the Exchange Act, to pay disgorgement in the amount of $105,409 and to pay a civil penalty of $105,409.  Seilhan also agreed not to deny any of the allegations in the SEC's complaint.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### A.    April 24, 2010 False and Misleading Statements

251.    On April 24, 2010, Defendant Suttles was BP's representative at a joint press conference with the United States Coast Guard.  During that press conference, BP and the Coast Guard said that they had detected ongoing releases of oil from the Macondo well at a rate of approximately 1,000 barrels per day.  Admiral Mary Landry said:   "It's a 1,000 barrels

emanating from 5,000 feet below the surface."   Defendant Suttles failed to correct Admiral Landry's statement.

252.   This statement, which caused BP ADS to trade at artificially inflated prices, was materially false and misleading because it did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 1,000 barrels per day.   BP was well aware by April 24, 2010, that the flow rate exceeded 1,000 barrels of oil per day.   For example, BP engineer Kurt Mix of the Hydraulic Kill Engineer Group had already circulated models showing flow rates of between 93,000 and 138,300 barrels per day if oil was flowing up the well casing, and 64,000 barrels per day if oil was flowing up the well annulus.   Another BP engineer in the Reservoir Engineer Group had told BP executives that oil could be flowing from the well at up to 100,000 barrels per day.

**B.**     **April 25, 2010 False and Misleading Statements**

253.   On April 25, 2010, Suttles was BP's representative at a joint press conference with the United States Coast Guard.   During that press conference, Suttles compared the amount of the oil leak to the amount of oil that was visible when the Deepwater Horizon caught fire a few days earlier, stating:   "[T]his is many, many, many times smaller than that. . . . This is a long way away from something more significant. . . .   There are many, many restrictions in this flow as it's coming out and that's why the rate is much lower than it was before."

254.   These statements, which caused BP ADS to trade at artificially inflated prices, were materially false and misleading because they did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded the amount of oil that appeared when the Deepwater Horizon caught fire and that the oil spill was significant.   BP's own internal models at that time were estimating flow rates as high as 138,300 barrels per day.

C.     **April 28, 2010 False and Misleading Statements**

255.     On April 28, 2010, Suttles was BP's representative at a joint press conference with the United States Coast Guard.  During that press conference, Suttles stood by BP's initial flow rate number of 1,000 barrels per day, but also stated that the NOAA's estimate of 5,000 barrels per day was within a range of what could be flowing from the well.  Thus, Suttles represented to the public that oil was flowing from the Macondo well at a range of 1,000 to 5,000 barrels per day.

256.     These statements, which caused BP ADS to trade at artificially inflated prices, were materially false and misleading because they did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  BP was well aware by April 28, 2010, that the flow rate exceeded 5,000 barrels of oil per day.   On April 28, 2010, the Flow-Assurance Engineer Group provided a memorandum with flow rates ranging up to 65,171 barrels per day even assuming the existence of conditions at the bottom and the top of the well that would restrict flow.  Those calculations were consistent with BP's prior estimates from the Hydraulic Kill Engineer Group and the Reservoir Engineer Group, which modeled flow rates of between 64,000 and 138,300 barrels per day.

D.     **April 29, 2010 False and Misleading Statements**

257.     On April 29, 2010, Suttles appeared on the CBS *Early Show* and stated that BP's best estimate of the flow rate was "somewhere between one and five thousand barrels a day."

258.     On NBC's *Today Show* Suttles stated that "the range [of oil spilling into the Gulf] is one to 5,000 barrels a day."

259.     On ABC's *Good Morning America*, Suttles stated that "between one and 5,000 barrels a day is a reasonable estimate."

260.     Later that day, BP filed its Form 6-K with the SEC for the period ended March 31, 2010.  In that filing, BP stated that the flow rate was "currently estimated at up to 5,000 barrels a day."

261.     These statements, which caused BP ADS to trade at artificially inflated prices, were materially false and misleading because they did not reveal that the BP's internal estimates of the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout were far higher than between 1,000 and 5,000 barrels of oil per day.  They also did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  BP was well aware by April 29, 2010, that a range of 1,000 and 5,000 barrels of oil per day was not a reasonable estimate.  For example, on April 29, 2010, the Hydraulic Kill Engineer Group circulated a PowerPoint presentation modeling flow rates as high as 60,500, 69,500, 77,000 and 146,000 barrels per day.  These calculations were consistent with the modeling previously done by the Flow-Assurance Engineer Group, yielding flow rates as high as 65,171 barrels per day, and by the Reservoir Engineer Group, which had estimated that as many as 100,000 barrels of oil per day could be flowing from the Macondo well.

**E.     April 30, 2010 False and Misleading Statements**

262.     On April 30, 2010, BP filed a Form 6-K with the SEC containing a press release stating that the flow of oil from the Macondo well was "currently estimated at up to 5,000 barrels a day."  This statement was repeated on BP's website that same day.

263.     These statements, which caused BP ADS to trade at artificially inflated prices, were materially false and misleading because they did not reveal that the BP's internal estimates of the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout were far higher than 5,000 barrels per day.  They also did not

reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  BP's internal estimates of the flow rate as of April 30, 2010, included flow rates as high as 60,500, 69,500, 77,000 and 146,000 barrels per day.

F.     **May 4, 2010 False and Misleading Statement**

264.     On May 4, 2010, BP filed a Form 6-K with the SEC containing a press release adopting the flow rate estimate of the NOAA:  "[C]urrent estimates by the US National Oceanic and Atmospheric Administration (NOAA) suggest that some 5,000 barrels (210,000 US Gallons) of oil per day are escaping from the well."

265.     This statement, which caused BP ADS to trade at artificially inflated prices, was materially false and misleading because they did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  For example, in early May 2010, the Petroleum Engineer Group estimated flow rates as high as 95,336 barrels per day.  These calculations were consistent with prior estimates of the Hydraulic Kill Engineer Group, the Flow-Assurance Engineer Group and the Reservoir Engineer Group.

G.     **May 5, 2010 False and Misleading Statements**

266.     On May 5, 2010, Defendant Hayward told the *Houston Chronicle* in an interview that "the guestimate remains 5,000 barrels a day."

267.     This statement, which caused BP ADS to trade at artificially inflated prices, was materially false and misleading because it did not reveal that the BP's internal estimates of the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout were vastly higher than 5,000 barrels per day.  It also did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of

the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day. BP was well aware by May 5, 2010, that 5,000 barrels of oil per day was not a reasonable estimate. For example, around May 5, 2010, Hayward requested that the Reservoir Engineer Group produce a chart of worst case discharge plots based on various flow rate restrictions. The chart produced by the Reservoir Engineer Group depicted flow rates of 5,000, 10,000, 20,000, 55,000, 109,000 and 162,000 barrels of oil per day. The conditions in the chart for achieving a flow rate of 5,000 and 10,000 barrels per day were unlikely, however, because they assumed a very narrow shallow-choke orifice. These calculations were consistent with the earlier modeling done by the Hydraulic Kill Engineer Group, the Flow-Assurance Engineer Group and the Petroleum Engineer Group.

268.   During a joint press conference with Unified Area Command on May 5, 2010, Suttles told a reporter that a flow rate of 60,000 barrels per day was only possible if there was an open hole at the well, and that "clearly that's not the situation we have at the moment."

269.   This statement, which caused BP ADS to trade at artificially inflated prices, was materially false and misleading because it did not reveal that BP's worst-case scenario internal calculations of flow rate far exceeded 60,000 barrels of oil per day and that BP's internal estimates were yielding flow rate's far above 5,000 barrels of oil per day based on the known conditions at the source at that time. For example, around May 5, 2010, the Reservoir Engineer Group was modeling worst case scenarios of 162,000 barrels of oil per day. Moreover, the Hydraulic Kill Engineer Group had produced a model estimating 77,000 barrels of oil per day even assuming certain restrictions in the well and at the wellhead.

### H.   <u>May 14, 2010 False and Misleading Statements</u>

270.   On May 14, 2010, Suttles appeared on ABC's *Good Morning America* and stated that BP's best estimate of the flow rate was "something around 5,000" barrels per day.

271.     On NBC's *Today Show*, Suttles stated that the 5,000 barrels per day number was "reasonable" and that the flow rate could only be a "bit above or below" the 5,000 barrels per day estimate.

272.     On CNN.com, Suttles was quoted as saying that 5,000 barrels per day was a good range."

273.     In the same article, Dudley stated that the volume could not be "much higher" than 5,000 barrels per day.

274.     These statements, which caused BP ADS to trade at artificially inflated prices, were materially false and misleading because they did not reveal that the BP's internal estimates of the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout were much higher than 5,000 barrels per day.  They also did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  BP was well aware by May 14, 2010, that the rate could be much higher than 5,000 barrels of oil per day.  For example, on May 11, 2010, the Petroleum Engineer Group created a model based on pressure readings obtained from the bottom of the blowout preventer that yielded flow rates ranging from 14,000 to 96,000 barrels of oil per day.  These flow rate calculations were consistent with numbers produced by BP's prior internal flow rate models.

I.     **May 17, 2010 False and Misleading Statements**

275.     On May 17, 2010, Suttles told reporters at a press conference that 5,000 barrels per day was BP's "best estimate" of the flow rate.

276.     This statement, which caused BP ADS to trade at artificially inflated prices, was materially false and misleading because it did not reveal that BP's internal estimates of the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the

Deepwater Horizon blowout were much higher than 5,000 barrels of oil per day.  It also did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  BP was well aware by May 17, 2010, that the rate could be much higher than 5,000 barrels of oil per day.  For example, on May 15, 2010, Suttles received an email from a BP senior engineer stating:  "We should be cautious standing behind a 5,000 bopd figure as our modeling shows that this well could be making anything up to ~ 100,000 bopd."  Indeed, BP's other flow rate models had all generated flow rates much higher than 5,000 barrels of oil per day.

### J.     May 19, 2010 False and Misleading Statements

277.    On May 19, 2010, McKay told Congress that BP's best flow rate estimate was 5,000 barrels per day.  He also stated that a flow rate of 70,000 barrels per day was not a possibility.

278.    These statements, which caused BP ADS to trade at artificially inflated prices, were materially false and misleading because it did not reveal that BP's internal estimates of the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  They also did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  BP was well aware by May 19, 2010, that 5,000 barrels per day was not its best flow rate estimate and that 70,000 barrels of oil per day was a possibility.  For example, on May 16, 2010, the Flow-Assurance Engineer Group confirmed in an internal email that the 5,000-barrels-per-day estimate had "little if no origin."  Moreover, on May 15, 2015, a senior BP engineer wrote in an email received by BP's executives that, "our modeling shows that this well could be making anything up to ~ 100,000 bopd."  Prior to that, the Hydraulic Kill Engineer Group, the Flow-Assurance Engineer Group,

the Reservoir Engineer Group and the Petroleum Engineer Group had all calculated flow rates of tens of thousands of barrels of oil per day.

### K.    May 21, 2010 False and Misleading Statements

279.    On May 21, 2010, Suttles again told reporters at a press conference that 5,000 barrels per day was BP's "best estimate" of the flow rate.

280.    Later that day, Suttles repeated that 5,000 barrels per day was BP's "best estimate" on the TV show *Good Morning America*.

281.    These statements, which caused BP ADS to trade at artificially inflated prices, were materially false and misleading because they did not reveal that BP's internal estimates of the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  They also did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day. BP was well aware by May 21, 2010, that 5,000 barrels per day was not its best flow rate estimate.  For example, in or around May 21, 2010, BP allowed Halliburton to use a flow rate of 30,000 barrels per day when modeling concrete work because that was the minimum flow rate that Halliburton could arrive at based on the temperature readings it had received from the well.  Moreover, the Hydraulic Kill Engineer Group, the Flow-Assurance Engineer Group, the Reservoir Engineer Group and the Petroleum Engineer Group had all calculated flow rates of tens of thousands of barrels of oil per day.

### L.    May 22, 2010 False and Misleading Statements

282.    On May 22, 2010, told NPR that 5,000 barrels per day was BP's best estimate of the flow rate.  In response to questions whether the flow rate could by 30,000 barrels per day or

70,000 barrels per day, Suttles stated that those rates were "too high," "not possible," and BP did not believe that the actual flow rate "was anywhere near" 30,000 or 70,000 barrels per day.

283.    These statements, which caused BP ADS to trade at artificially inflated prices, were materially false and misleading because it did not reveal that BP's internal estimates of the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  They also did not reveal that the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout vastly exceeded 5,000 barrels per day.  BP was well aware by May 22, 2010, that 5,000 barrels per day was not its best flow rate estimate and that 30,000 or 70,000 barrels of oil per day were a possibility.  For example, on May 16, 2010, the Flow-Assurance Engineer Group confirmed in an internal email that the 5,000-barrels-per-day estimate had "little if no origin."  Moreover, on May 15, 2015, a senior BP engineer wrote in an email received by BP's executives that, "our modeling shows that this well could be making anything up to ~ 100,000 bopd."  In fact, the Hydraulic Kill Engineer Group, the Flow-Assurance Engineer Group, the Reservoir Engineer Group and the Petroleum Engineer Group had all calculated flow rates of tens of thousands of barrels of oil per day.  Furthermore, in or around May 21, 2010, BP allowed Halliburton to use a flow rate of 30,000 barrels per day when modeling concrete work because that was the minimum flow rate that Halliburton could arrive at based on the temperature readings it had received from the well.

284.    As stated by the Eastern District of Louisiana in its January 15, 2015 post-trial findings of fact, "[t]here is no dispute that BP lied about the amount of oil that flowed from the well."

## ADDITIONAL ALLEGATIONS OF SCIENTER

285.   Plaintiff re-alleges and incorporates by reference each and every paragraph, fact, and allegation contained above as if fully set forth herein.

286.   At all relevant times, Defendants were aware or recklessly disregarded that their statements regarding the flow rate of the oil spilling into the Gulf of Mexico from the Macondo well as a result of the Deepwater Horizon blowout were false and omitted material information concerning the true magnitude of the Gulf Oil Disaster.

287.   BP's workgroups of scientists and engineers estimated flow rates well above 5,000 barrels of oil per day, many of which were estimates of tens of thousands of barrels of oil per day.  These workgroups communicated their results to BP's senior management in meetings, via email, and through PowerPoint presentations.

288.   As BP's highest executive during the Gulf Oil Disaster, Defendant Hayward knew, or was reckless in not knowing BP's actual flow rate estimates.  Indeed, around May 5, 2010, Hayward directed BP's engineers and scientists to model worst case scenarios of flow rate, which scenarios included figures of 100,000 barrels of oil per day.  Hayward left BP following the Gulf Oil Disaster.

289.   As BP's officer in charge of co-managing the spill response with the U.S. Coast Guard, Defendant Suttles knew, or was reckless in not knowing BP's actual flow rate estimates.  Indeed, during the relevant time period Suttles attended twice daily internal BP meetings in which flow rate analysis was discussed.  Further, on May 15, 2010, Suttles received an email from a BP senior engineer questioning the 5,000-barrel-per-day public "best estimate" because BP's models were showing a flow rate of approximately 100,000 barrels of oil per day.  Suttles had direct knowledge of many of the estimates that BP's engineers were creating.  Suttles left BP following the Gulf Oil Disaster.

290.    BP executives' strict instructions to BP engineers to keep their flow rate calculations confidential further demonstrates Defendants' scienter.   BP was motivated to suppress the truth about the actual flow rates to avoid further harm to its reputation and business, and to avoid government fines.

291.    Defendants' scienter is further established by the number of criminal and civil actions by the government against BP and individuals formerly affiliated with BP concerning the flow rate misrepresentations.   BP E&P has pled guilty to, among other things, obstruction of Congress and has paid a fine of more than $5.2 billion.   BP p.l.c. has consented to entry of a final judgment against it for violating Section 10(b) and Section 13(a) of the Exchange Act and has, among other things, paid the SEC a penalty of $525 million.   One former BP engineer has been indicted by a federal grand jury for obstruction of justice for deleting text messages to BP management concerning his flow rate estimates.   Another former employee of BP has consented to entry of a final judgment against him for insider trading for selling BP ADS when he was aware of BP's non-public, internal flow rate estimates.

## PRESUMPTION OF RELIANCE

292.    Plaintiff intends to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:    (a) Defendants made public misrepresentations or failed to disclose material facts during the relevant time period; (b) the omissions and misrepresentations were material; (c) BP ADS traded in efficient markets; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the BP ADS; and (e) the Assignors purchased BP ADS, through their investment advisors, between the time Defendants misrepresented or failed to disclose material facts and the time when the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

293.    The market for BP ADS was open, well-developed and efficient at all relevant times.  As a result of the aforementioned materially false and misleading statements and failures to disclose, BP ADS traded at artificially inflated prices during the relevant period.  The artificial inflation continued until the time the market came to realize the nature and extent of the oil spill.

294.    At all relevant times, the markets for BP ADS were efficient for the following reasons, among others:  (a) BP filed periodic reports with the SEC; (b) BP ADS met the requirements for listing, and were listed and actively traded, on the NYSE; (c) numerous analysts followed BP; and (d) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

295.    The Assignors, through their investment advisors, purchased BP ADS in reliance on the market price of the BP ADS, which reflected all the information in the market, including the misstatements by Defendants.

## LOSS CAUSATION

296.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by the Assignors.  Between April 26 and May 28, 2010, the market prices of BP ADS were artificially inflated as a direct result of Defendants' materially and misleading statements and omissions.  As the truth began to emerge about the scope of the oil spill and the flow rate, the price of BP ADS dropped and the Assignors were damaged.

297.    The Deepwater Horizon exploded after the close of the markets on April 20, 2010.  On April 20, 2010, BP ADS closed at a price of $60.48.

298.    An oil leak from the Macondo well was first reported on April 24, 2010.  On April 23, 2010, BP ADS closed at a price of $59.88.

299.    On April 29, 2010, the Secretary of the Department of Homeland Security, Janet Napolitano, stated during a White House press briefing that she would be designating the oil spilling from the Macondo well a "spill of national significance."  During that same press conference, Rear Admiral Sally Brice-O'Hara announced that the U.S. Coast Guard expected oil to reach land by the following day.  Shortly thereafter, Governor Bobby Jindal declared a state of emergency for Louisiana due to the encroaching oil spill.  These statements indicated that the flow rate of the oil spill was substantially higher than BP's public disclosures.

300.    As a result of these disclosures, BP shares tumbled.  On April 29, 2010, BP ADS closed at a price of $52.56, down $4.78 from the closing price of $57.34 on April 28, 2010. Nevertheless, BP ADS were still trading at an artificially inflated price because the full extent of Defendants' materially and misleading statements and omissions had not yet been revealed.

301.    On May 1, 2010, a report from the Associated Press stated that an analysis of satellite images by the University of Miami indicated that the oil slick on the ocean's surface had tripled in size over the previous two days.  Although the volume of oil could not be measured precisely by viewing satellite images, the increase in the size of the slick indicated an increase in the flow rate.

302.    Also on May 1, 2010, the White House suddenly announced that President Obama would be flying down to Louisiana the following day to visit the potentially affected areas.  On May 2, 2010, the President remarked from Louisiana that the country was dealing with "a massive and potentially unprecedented environmental disaster. The oil that is still leaking from the well could seriously damage the economy and the environment of our Gulf States and it could extend for a long time.  It could jeopardize the livelihoods of thousands of Americans who call this place home."

303.   These statements indicated that BP was not being forthright about the amount of oil floating from the well and the extent of the oil spill.

304.   As a result of these disclosures, on May 3, 2010, BP ADS closed at a price of $50.19, down $1.96 from the closing price of $52.15 on April 30, 2010.  Nevertheless, BP ADS were still trading at an artificially inflated price because the full extent of Defendants' materially and misleading statements and omissions had not yet been revealed.

305.   On Saturday, May 8, 2010, BP's attempt to stop the oil spill with a giant coffer dam failed.  The *Wall Street Journal* reported that the coffer dam was destabilized by the large amount of hydrates it encountered, which were caused by the oil leak, when being lowered onto the well.  Thus, there was apparently more oil leaking from the well than BP had previously disclosed.

306.   Also, on May 8, 2010, the *Associated Press* reported that tar balls believed to be from the oil spill had washed ashore in Alabama.  These tar balls indicated that the oil spill had reached further east than expected.

307.   On May 9, 2010, the *Telegraph* reported that Defendant Hayward had stated during an interview that BP could be spending as much as $10 million per day on clean-up costs, which was a significant increase over the $6-milliion-per-day BP had previously disclosed.  The increase in costs indicated that the oil spill was larger than BP was letting on.

308.   As a result of these disclosures, on May 10, 2010, the next trading day, BP ADS closed at a price of $48.75, down $0.31 from the closing price of $49.06 on May 7, 2010.  Nevertheless, BP ADS were still trading at an artificially inflated price because the full extent of Defendants' materially and misleading statements and omissions had not yet been revealed.

309.    On May 24, 2010, several news sources, including the *Guardian*, reported that: (1) the total cost of the oil spill to BP had risen to $760 million, up $135 million (or 22%) from BP's May 18, 2010 estimate; (2) according to the U.S. Coast Guard, more than sixty-five miles of the Gulf coast had been hit by oil; (3) the RITT was not collecting as much oil as previously estimated; and (4) BP was facing increased pressure from the President to stop the oil spill.  All of these events indicated that the severity of the spill was increasing beyond what BP was telling the public.

310.    As a result of these disclosures, on May 24, 2010, BP ADS closed at a price of $41.86, down $2.00 from the closing price of $43.86 on May 21, 2010.  Nevertheless, BP ADS were still trading at an artificially inflated price because the full extent of Defendants' materially and misleading statements and omissions had not yet been revealed.

311.    On May 26, 2010, BP commenced the top kill and junk shot procedures, which it had indicated would completely stop the oil spill if successful.  In order for the top kill to work, BP needed to pump enough drilling mud into the well to push back the oil flowing out of the well.  If the top kill alone was insufficient, BP intended to shoot debris (consisting of, among other things, diapers and golf balls) into the well to obstruct the oil's flow and to try and reduce the amount of oil that was escaping.  In preparation for the top kill operation, BP had prepared a memorandum stating that the procedure would not succeed if the flow rate was higher than 15,000 barrels of oil per day.

312.    On May 29, 2010, several news outlets reported that the top kill and junk shot operation had failed.  If the flow rate had been anywhere close to 5,000 barrels per day, these procedures should have succeeded in stopping the oil spill.

313.     On May 30, 2010, Representative Markey of the House Energy Subcommittee on Energy and Environment appeared on CBS's *Face the Nation* and stated that, based on internal documents he had received from BP, BP's initial estimates of oil gushing into the Gulf of Mexico from the Macondo well were larger than what BP had publicly stated the flow rate was. Representative Markey explained to John Dickerson that BP had misstated the oil flow rate to avoid government fines.  Representative Markey remarked that the flow rate might be as high as 20,000 barrels per day.

314.     As a result of these disclosures, on June 1, 2010, the next trading day, BP ADS closed at a price of $36.52, down $6.43 from the closing price of $42.95 on May 28, 2010. Nevertheless, BP ADS were still trading at an artificially inflated price because the full extent of Defendants' materially and misleading statements and omissions had not yet been revealed.

315.     On June 9, 2010, political pressure mounted on BP to make sure it had enough reserves to cover the costs of the oil spill.  According to the *Associated Press,* BP was considering suspending payment of its quarterly dividend to cover the cost of the oil spill. Indeed, a group of thirty members of the U.S. House of Representatives sent an open letter to Defendant Hayward asking him to concentrate BP's resources on spill containment and clean up, rather than on paying shareholder dividends and on a public relations campaign to limit the damage to BP's image.  The news that BP may have to suspend its dividend to meet the cleanup costs of the oil spill indicated that the flow rate was much higher and the spill was larger than BP was indicating, even more so than 20,000 barrels of oil per day.

316.     As a result of these disclosures, on June 9, 2010, BP ADS closed at a price of $29.20, down $5.48 from the closing price of $34.68 on June 8, 2010. Nevertheless, BP ADS

were still trading at an artificially inflated price because the full extent of Defendants' materially and misleading statements and omissions had not yet been revealed.

317.    On June 11, 2010, Rear Admiral James Watson wrote a scathing letter to BP, which was made public on June 12, 2010, criticizing the oil company for not having the capacity to deal with the oil spill.  "It is clear that additional capacity is urgently needed," said Admiral Watson. "I am concerned that your current plans do not provide for maximum mobilization of resources to provide the needed collection capacity with the revised flow estimates [provided by the government]."  The government had increased its estimate to up to 40,000 barrels per day.

318.    On June 12, 2010, the *Associated Press* reported that masses of oil washed ashore in Alabama.  Previously, as noted above, tar balls had been found in Alabama.  The pollution reported on June 12, 2010, by the *Associated Press* was significantly worse:  "Waves of unsightly brown surf hit the shores in [Alabama], leaving stinking, dark piles of oil that dried in the hot sun and extended up to 12 feet from the water's edge for as far as the eye could see."

319.    On June 14, 2010, BP's board met to further consider suspending the dividend to pay for the cost of the oil spill.  This news put the market on notice that the flow rate could be 40,000 barrels of oil per day or higher.

320.    As a result of these disclosures, on June 14, 2010, BP ADS closed at a price of $30.67, down $3.30 from the closing price of $30.67 on June 11, 2010.

## NO SAFE HARBOR

321.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made.  Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially

from those projected."  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BP who knew that those statements were false when made.

## FIRST CAUSE OF ACTION

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

322.  Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

323.  This cause of action is brought against Defendants BP p.l.c., BP America, BP E&P, Hayward, and Suttles for fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

324.  Defendants BP p.l.c., BP America, BP E&P, Hayward and Suttles both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to carry out a plan, scheme and course of conduct that was intended to and did:  (i) deceive the investing public, including the Assignors, as alleged herein; and (ii) cause the Assignors to purchase BP ADS, through their investment advisors, at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

325.     Defendants BP p.l.c., BP America, BP E&P, Hayward and Suttles both directly and indirectly:  (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of BP ADS in an effort to artificially inflate and maintain the market prices for BP ADS in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

326.     As result of Defendants' conduct, the Assignors purchased BP ADS, through their investment advisors, at artificially inflated prices and Plaintiff has been damaged by the decline in price of the BP ADS as alleged herein.

327.     Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re BP plc Securities Litigation*, No. 4:10-md-02185 (S.D. Tex.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## SECOND CAUSE OF ACTION

### Violations of Section 20(a) of the Exchange Act
### Against All Defendants

328.     Plaintiff repeats and realleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

329.     This cause of action is brought against Defendants BP p.l.c., BP America, BP E&P, Hayward and Suttles for control person liability under Section 20(a) of the Exchange Act.

330.     These Defendants acted as controlling persons within the meaning of Section 20(a) of the Exchange Act as alleged herein.  Specifically:

(a)      Defendant Hayward directly or indirectly controlled Defendant BP p.l.c. as alleged above;

(b)      Defendants BP p.l.c. and Hayward directly or indirectly controlled Defendant BP America as alleged above;

(c)      Defendants BP p.l.c., BP America, Hayward and Suttles directly or indirectly controlled Defendant BP E&P as alleged above; and/or

(d)      Defendants BP p.l.c., BP America, BP E&P directly or indirectly controlled Defendants Hayward and Suttles as alleged above.

331.   By virtue of their high-level positions, their ownership and contractual rights, their participation in and/or awareness of BP p.l.c.'s, BP America's, and/or BP E&P's operations and/or their intimate knowledge of BP p.l.c.'s, BP America's, and/or BP E&P's false statements about flow rates that were disseminated to the investing public, Defendants Hayward and Suttles had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of BP p.l.c., BP America, and/or BP E&P, including the content and dissemination of the various statements that Plaintiff contends are false and misleading and/or omitted material information.  Defendants Hayward and Suttles had the power to cause the false statements alleged herein to either not be made or be corrected.

332.   Each of Defendants Hayward and Suttles had direct and supervisory involvement in the day-to-day operations of BP p.l.c., BP America, and/or BP E&P, and is presumed to have had the power to control or influence the particular transactions, statements, and omissions giving rise to the securities violations as alleged herein, and to have exercised the same.

333.   By reason of the conduct alleged in Count I the Complaint, Defendants BP p.l.c., BP America, BP E&P, Hayward and Suttles are liable for violations of Section 10(b) and Rule

10b-5 promulgated thereunder.  By virtue of their positions as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.

334.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff suffered damages in connection with the Assignors' purchases of BP ADS.

335.    Taking into account, *inter alia,* tolling of the limitations period by the filing of the class action complaint against Defendants in the matter *In re BP plc Securities Litigation*, No. 4:10-md-02185 (S.D. Tex.), Plaintiff has brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief and judgment, as follows:

(a)    Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)    Awarding Plaintiff its reasonable costs and expenses incurred in this action; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury as to all issues so triable.


Dated: April 23, 2015                    Respectfully submitted,

                                         /s/ Stewart H. Thomas
                                         _____
                                         Stewart H. Thomas
                                         Attorney-in-Charge
                                         State Bar No:  19868950
                                         Southern District of Texas Bar No: 13108
                                         HALLETT & PERRIN, P.C.
                                         1445 Ross Avenue, Suite 2400
                                         Dallas, Texas  75202
                                         Telephone:  214.922.4114
                                         Facsimile:  214.922.4142
                                         E-mail: sthomas@hallettperrin.com

Of Counsel:

Tom M. Dees, III
State Bar No.:  24034412
Southern District of Texas Bar No. 36606
HALLETT & PERRIN, P.C.
1445 Ross Avenue, Suite 2400
Dallas, Texas  75202
Telephone:  214.922.4146
Facsimile:  214.922.4142
E-mail: tdees@hallettperrin.com

Lawrence M. Rolnick
Marc B. Kramer
Thomas E. Redburn, Jr.
Sheila A. Sadighi
Michael J. Hampson
LOWENSTEIN SANDLER LLP
1251 Avenue of the Americas
New York, NY  10020
Telephone: 212.262.6700
Facsimile: 212.262.7402

                                         *Attorneys for Plaintiff BP Litigation Recovery I,
                                         L.L.C.*